UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CHARLES NEGY,

        Plaintiff,

v.

                              No. 6:23-cv-00666-CEM-EJK

BOARD OF TRUSTEES OF THE
UNIVERSITY OF CENTRAL FLORIDA,
in their official capacities; and
S. KENT BUTLER, ALEXANDER
CARTWRIGHT, TOSHA DUPRAS,
MICHAEL JOHNSON, and NANCY
MYERS, in their individual capacities,

        Defendants.

## FIRST AMENDED COMPLAINT, DEMAND FOR A JURY TRIAL, REQUEST FOR DECLARATORY RELIEF, AND REQUEST FOR INJUNCTIVE RELIEF

      Plaintiff Charles Negy, by and through his undersigned attorneys, files

this First Amended Complaint for violations of the First and Fourteenth

Amendments pursuant to 42 U.S.C. § 1983, as well as for negligence, abuse of

process, and intentional infliction of severe emotional distress. In support of

this complaint, Charles Negy respectfully alleges as follows:

## NATURE OF THE ACTION

1.      In the name of a crusade "to be actively anti-racist," as Defendant Alexander Cartwright announced on June 2, 2020, the University of Central Florida (UCF) harassed and retaliated against Professor Charles Negy because he dared to publicly express viewpoints out of step with the prevailing campus orthodoxy on anti-racism.

2.      After Charles Negy posted several tweets to his personal Twitter account expressing his view that, contrary to the ascendant orthodoxy on campus, Blacks are not systematically oppressed in the United States, he became the target of a Twitter mob that demanded he be fired. Protests erupted at UCF and even at Negy's home, leading him to require police protection.

3.      Forbidden by the First Amendment to explicitly fire him for his tweets, UCF administrators publicly solicited people to come forward with complaints of discrimination and harassment against Professor Negy and then launched a malicious, pretextual investigation into every aspect of his 22-year career at the university.

4.      UCF's investigation culminated in a 9-hour interrogation of Professor Negy, during which a senior UCF administrator barraged Negy with hundreds of allegations that she had previously refused to give him notice of, despite his repeated requests. The interrogation — which included wide-ranging allegations, many of which bordered on the absurd — made

2

clear that UCF was not merely investigating Negy for alleged harassment and discrimination, but rather was looking for any information it could use to get rid of a faculty member who had become politically inconvenient to the university administration.

5.      Following an investigation which dragged on, without good cause, for 7 months, UCF summarily terminated Negy in January 2021. Maliciously invoking an inapplicable exception to the collective bargaining agreement ("CBA") requiring that tenured faculty receive six months' notice of termination, UCF terminated Negy effective immediately. As a result of this sudden loss of income, Negy — who is the sole caretaker of his mentally and physically disabled brother — was forced to sell his home and move in with a relative.

6.      Negy pursued a grievance through his faculty union for violating the CBA, and in May 2022, an arbitrator ordered UCF to reinstate Negy with back pay and benefits, finding he was terminated without just cause. However, the award cannot compensate Negy for the massive loss he incurred on the sale of his home; for the out-of-pocket medical expenses he faced after UCF's destruction of his life led him to be diagnosed with anxiety and depression; or for the severe emotional distress he suffered for nearly two years at the hands of UCF administrators who, because they disliked his political views, treated him as less than human.

3

## THE PARTIES

7.     Plaintiff Charles Negy is, and was at all times relevant to this Complaint, an Associate Professor of Psychology at the University of Central Florida, where he has taught since 1998.

8.     Defendant Board of Trustees of the University of Central Florida ("the Trustees") is the 13-member governing body of UCF, a governmental entity, and is responsible for the administration of UCF, including but not limited to UCF's compliance with laws, rules, regulations, and requirements. At all times relevant to this complaint, the Trustees acted under color of state law and are sued in their official capacities.

9.     At all times relevant to the Complaint, Defendant S. Kent Butler was UCF's Interim Chief Equity, Inclusion and Diversity Officer. Immediately following Negy's expression of dissenting views on Twitter, Defendant Butler, along with Defendants Cartwright and Johnson, publicly announced an inquiry into Negy's classroom conduct and solicited UCF community members to come forward with complaints of bias and discrimination against Negy. Defendant Butler acted under color of state law and is sued in his individual capacity.

4

10.     Defendant Alexander Cartwright is the President of UCF. Immediately following Negy's expression of dissenting views on Twitter, Defendant Cartwright, along with Defendants Butler and Johnson, publicly announced an inquiry into Negy's classroom conduct and solicited UCF community members to come forward with complaints of bias and discrimination against Negy. Defendant Cartwright acted under color of state law and is sued in his individual capacity.

11.     Defendant Tosha Dupras was, at all times relevant to this Complaint, the Interim Dean of UCF's College of Sciences. Defendant Dupras issued Negy's notice of termination and invoked an inapposite provision of UCF's CBA to deny Negy the customary six months' notice of termination afforded to tenured faculty, causing him severe damage. Defendant Dupras acted under color of state law and is sued in her individual capacity.

12.     Defendant Michael Johnson is UCF's Provost and Executive Vice President for Academic Affairs. Immediately following Negy's expression of dissenting views on Twitter, Defendant Johnson, along with Defendants Butler and Cartwright, publicly announced an inquiry into Negy's classroom conduct and solicited UCF community members to come forward with complaints of bias and discrimination against Negy. Defendant Johnson acted under color of state law and is sued in his individual capacity.

13.     Defendant Nancy Myers is the Director of UCF's Office of Institutional Equity ("OIE"). Defendant Myers served as the investigator in the disciplinary proceedings against Negy, proceedings which were conducted without affording Plaintiff due process of law. Defendant Myers acted under color of state law and is sued in her individual capacity.

## JURISDICTION AND VENUE

14.     This case arises under the Constitution and laws of the United States, specifically 42 U.S.C. § 1983. Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

15.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over all other claims so related to the claim in this action with such original jurisdiction that they form part of the same case or controversy under Article III of the U.S. Constitution.

16.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391. The defendants are residents of the State in which this district is located and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTS

***Negy Engages in Political Expression on Twitter***

6

17.     At all times relevant to this Complaint, Professor Negy maintained a Twitter account for his personal use, using the handle @CharlesNegy. Negy's Twitter profile does not mention his affiliation with UCF and states "Opinions are my own."

18.     Negy is a minority, being both gay and Hispanic, and in fact was identified by UCF in 1998 as a "Diversity Enhancement Hire."

19.     However, Negy holds opinions that do not align with the way the way minority individuals are expected to think by those in power at America's colleges and universities, including UCF. In particular, Negy disagrees with the critical race theory that is ascendant on today's campuses.

20.     In light of national outrage over the fatal use of force by police against unarmed Black men and women, particularly the May 2020 murder of George Floyd, colleges and universities have come under tremendous pressure to take action to fight "systemic racism" on campus.

21.     UCF has not been immune to this pressure. On June 2, 2020, for example, Defendant Alexander Cartwright, UCF's president, issued a statement making "a commitment from our university to not merely celebrate our diversity, but to be actively anti-racist." Defendant Cartwright's message emphasized that education and reflection on these issues was insufficient, and that they "must be paired with action and a commitment to stand against racism in all its forms."

22.     In response to the national conversation around race happening at that time, Negy posted several tweets to his personal Twitter account between May 29 and June 3, 2020, expressing his view that Blacks are not systemically oppressed in the United States.

***UCF is Inundated by Demands to Fire Negy***

23.     Negy's tweets garnered an angry response on social media. Almost immediately, the hashtag #UCFfirehim began trending on Twitter.

24.     UCF quickly came under media scrutiny because of Negy's tweets. *See, e.g.*, Jason Dill, "A UCF Professor Tweeted About 'Black Privilege.' Then #UCFFireHim Started Trending," Miami Herald (June 4, 2020), https://www.miamiherald.com/news/state/florida/article243261961.html.

25.     The pressure on UCF mounted immediately. On June 4, 2020, UCF's Assistant Vice President for Board Relations, Karen Monteleone, wrote UCF's Board of Trustees to say the following: "A UCF professor's personal Twitter posts have gone viral and have received significant media attention. Overnight, there have been thousands of posts on social media and hundreds of individuals have emailed university offices, including more than 175 submissions to the Board of Trustees account."

26.     One of these social media posts came from a Florida politician, Rep. Anna Eskamani, who has more than 80,000 followers on Twitter. On

June 5, 2020, Rep. Eskamani tweeted a request for "help," asking members of the UCF community to report "any abusive or discriminatory behavior at UCF by Dr. Negy," and noting that complaints could be "anonymous."

27.    On June 11, 2020, UCF's Student Senate passed a resolution calling on the university to fire Negy for his tweets. The resolution stated that "Negy's comments and views are, in fact, being supported and not condemned in the strongest terms if his employment is continued at this university."

28.    Also on June 11, 2020, the Psychology Department sent out an official departmental message stating that the opinions Negy expressed on Twitter were "insensitive, hurtful, offensive, and wrong," and urging students to come forward, even anonymously, with allegations of "classroom bias," since that — unlike Negy's constitutionally protected tweets — would be punishable.

29.    On June 14, 2020, protesters gathered on the UCF campus to demand Negy's firing, chanting "UCF, fire him!"

30.    An online petition demanding that UCF fire Negy received more than 34,000 signatures. *See* "UCF: Fire Psychology Professor Charles Negy," Change.org, https://www.change.org/p/university-of-central-florida-ucf-fire-psychology-professor-charles-negy.

*UCF's Administration Rushes to Placate Those Angered by Negy's Tweets*

31.     The UCF administration acted immediately to mollify those demanding that Negy be fired for his protected speech.

32.     On June 4, 2020, for example, Defendant Butler released a video statement on UCF's official Twitter account effectively admitting that UCF hoped to have Negy fired. Butler stated, "We're trying to do the right thing. Sometimes that takes change and takes time … **The #UCFFirehim I understand all of that but the fact of the matter is it's not going to happen overnight.**" (Emphasis added.)

33.     On June 4, 2020, Defendant Cartwright attended a virtual town hall with students angry over Negy's tweets. Cartwright told them "I promise you this is a matter that has our full attention, and we have launched an inquiry to quickly — but fully — evaluate this situation."

34.     On June 4, 2020, Defendant Dupras sent an email message to all College of Sciences students, faculty, and staff about Negy's Twitter comments, stating that "UCF leadership is aware of these tweets and are actively working to address this situation. I cannot speak to next steps until they are finalized, but I'm reaching out to let you know that the administration is moving forward."

35.     Also on June 4, 2020, Defendants Butler, Cartwright, and Johnson posted a statement to the UCF website entitled "Addressing Intolerance in our Community." The headline underneath the title stated: "**Members of UCF's leadership urge current and former students to report discriminatory behavior they may have experienced from faculty and staff**." (Emphasis added).

36.     Defendants' post was intended to specifically target Negy. It stated that "we are disgusted by the racist posts one of our faculty members has shared on his personal Twitter account" and thanked students for speaking out about their outrage. Defendants' post then stated: "If any student, current or former, believes they may have experienced abusive or discriminatory behavior by any faculty or staff member, we want to know about it. UCF takes every report seriously. Concerns can be reported to UCF's IntegrityLine, which also takes anonymous complaints, at www.ucfintegrityline.com or 855-877-6049."

37.     On June 5, 2020, Negy was advised by UCF police that protesters were organizing to come to his home, and that he should be on guard for his safety. Negy wrote to Defendant Cartwright to say that "the way you have vilified me publicly has contributed to this situation," and to ask Defendant Cartwright to send out a message cautioning students against violence and

against protesting at people's private homes. Defendant Cartwright did not send any such message.

38.    Instead, on June 5, 2020, Defendants Cartwright, Butler, and Johnson hosted a "Virtual Conversation about Race and Unity." During that "conversation," Defendant Cartwright called Negy's tweets "abhorrent" and stated that "Although everyone has a right to their personal beliefs, we cannot allow that to cross over into our classrooms or into our workplace if it hurts people."

39.    The first question from a student during the June 5 "conversation" was "what avenues" UCF had open to fire Negy if his tweets were protected by the First Amendment.

40.    Defendant Johnson answered that if a faculty member is "offensive" in the classroom, "we have the capacity to act."

41.    Later in the conversation, an incoming student asked "what is going to be done" about Negy. Defendant Butler answered that "the wheels are in motion in terms of what needs to happen in regards to that… believe that by the time you get on the campus as a freshman, it will have been dealt with."

42.    On June 9, 2020, the staff of the Multicultural Student Center issued a letter addressed to all "UCF Knights" in response to the Twitter controversy stating that "Negy's discrimination against people of color is not

to be tolerated or taken lightly." The letter concluded by encouraging students to "report to the Just Knights Response Team," a team created to assist those "who have been impacted by hate or bias-related incidents."

43.     On June 13, 2020, egged on by UCF's repeated expressions of outrage, UCF students protested in front of Negy's home. After two hours of protesting at the entrance to Negy's neighborhood, they drove up and down his street for 40 minutes, blowing their horns non-stop, with a megaphone, shouting to all of his neighbors "Negy is a racist" and "UCF must Fire Racist Negy." Negy had six Orange County sheriff's officers at his home that day, four of them parked in front of his house to prevent the UCF protesters from coming onto his property.

44.     On June 14, Defendant Cartwright attended a protest held by students demanding Negy's firing.

45.     At the June 14 protest, one of the students in attendance said to Defendant Cartwright that Negy "should have been fired before he got tenure." Defendant Cartwright agreed with the student, responding **"[S]o, one thing is that.** One is also looking at the Office of Diversity, Equity, and Inclusion, I mean that office, honestly… is understaffed."[1] (Emphasis added.)

*UCF Subjects Negy to an Intrusive and Protracted Investigation*

---

[1] https://twitter.com/UCFKnightNews/status/1272310037617291264

46. Negy has taught at UCF since 1998 and has received consistently superior performance reviews. In the four years leading up to his termination, he received an evaluation rating of "Outstanding" for his instruction and advising.

47. Following the administration's public solicitation of complaints on June 4, 2020, however, UCF received a litany of allegations, many anonymous, about Negy's classroom teaching.

48. Without informing Negy that there were complaints against him, UCF began an investigation.

49. Negy learned about this investigation the way the rest of the general public did: through the media.

50. Negy received no formal notice of this investigation until more than a month later, on July 17, 2020.

51. On July 17, 2020, Defendant Myers sent Negy a letter notifying him that he was under investigation by UCF's Office of Institutional Equity ("OIE"), stating, "Beginning on June 4, 2020, OIE received multiple reports that you posted derogatory, discriminatory and unprofessional statements on a Twitter account, and that you subjected students to discriminatory harassment based on race, ethnicity, national origin, sexual orientation, religion, sex, gender identity/expression, and disability in the classroom."

14

52.     The June 4, 2020 date identified by Defendant Myers was no coincidence: it was the date on which Defendants Butler, Cartwright, and Johnson posted their missive on UCF's website soliciting people to come forward with complaints against Negy in a pretextual effort to justify firing him.

53.     The notice provided to Negy on July 17, 2020, did not include enough information to allow him to prepare for his investigative interview.

54.     Pursuant to Department of Education guidance in effect at the time, "notice" in a disciplinary matter alleging sexual harassment must include "the identities of the parties involved, the specific section of the code of conduct allegedly violated, the precise conduct allegedly constituting the potential violation, and the date and location of the alleged incident." The representative "examples" provided by Defendant Myers did not satisfy this notice requirement.

55.     On July 21, 2020, Negy, through counsel, requested further information about the nature of the alleged misconduct, the dates and times of the alleged misconduct, and the parties involved. However, Defendant Myers continued to obfuscate and deny Negy the information he needed in order to prepare for an investigative interview.

56.     On July 31, 2020, Defendant Myers replied to Negy's request for further information by informing him that the alleged misconduct took place

15

"from 2005 through 2020," and included additional examples of conduct that allegedly violated university policy. With regard to Negy's request for the identities of the parties involved, Defendant Myers provided him with a partial list of names in a separate file, with no information about who had alleged what, or when.

57.     Upon information and belief, a large number of the complaints brought against Negy and considered by Defendant Myers were made anonymously.

58.     On August 4, 2020, Negy responded to Defendant Myers' email of July 31, expressing his concern that he would "like to produce witnesses who can attest that I did not say the things I am alleged to have said," but that "with no information about when in the past 15 years I am alleged to have made each of these statements, I have no way of identifying relevant witnesses."

59.     Negy's August 4, 2020 email to Defendant Myers also asked whether there were additional allegations of which he had not yet been informed.

60.     Defendant Myers responded to Negy's August 4 email on August 5, 2020. She did not address Negy's request for further information that would allow him to identify witnesses. In response to his question about

16

additional allegations, Defendant Myers wrote simply that "OIE will not be providing additional details about the allegations … prior to your interview."

61.   On August 7, 2020, Negy had his first investigative interview with OIE, conducted by Defendant Myers.

62.   That interview lasted for more than four hours and concluded only when Negy, exhausted, asked Defendant Myers if the interview was almost finished and learned that she had not even gone through half of the allegations. Myers agreed to conduct the remainder of the interview on a second day of questioning.

63.   On August 14, 2020, Negy had his second investigative interview with OIE, conducted by Defendant Myers. That interview lasted for four hours.

64.   The courses that Negy teaches, including Cross-Cultural Psychology and Sexual Behavior, include discussions of controversial and sensitive topics.

65.   During her 8+ hours of interrogation, Defendant Myers barraged Negy with a litany of accusations spanning 15 years. Most of these allegations were simply objections to Negy's course content and pedagogy. For example, multiple individuals allegedly complained that he lectured about certain sexual practices specific to particular Native American and African tribes, despite the fact that this lecture on cross-cultural sexual

practices is wholly germane to the subjects he teaches, has been a longstanding part of his pedagogy, and has never been the subject of a complaint in his student evaluations.

66.     It was also apparent that Defendant Myers had not even bothered to consolidate repetitive allegations, as many of the allegations she asked him about were variations of the same question. This repetitive questioning served no purpose other than to harass and intimidate Negy.

67.     Defendant Myers also asked Negy about a variety of allegations that had absolutely nothing to do with alleged discriminatory harassment, including whether he had ever bribed a health care official while traveling abroad and whether he used departmental resources while writing his book, demonstrating that this was not a good-faith investigation into allegations of harassment but rather a fishing expedition undertaken in the desperate hope of finding some basis to discipline Negy other than his constitutionally protected expression on Twitter.

68.     On August 27, 2020, several weeks after the second of Negy's two interrogation sessions, Defendant Myers informed Negy via email that she anticipated the investigative report would be completed "in September 2020."

69.     September 2020 came and went as Negy continued to live under the threat of punishment. On October 1, 2020, Defendant Myers wrote Negy again to state that, due to personal matters, she had been out of the office

18

and now anticipated that "the report will be issued in October." She stated that she would "update [him] if that changes."

70.     October 2020 came and went with no report and no "update."

71.     At all times relevant to this complaint, UCF policy required that an investigation be completed within 90 days absent "good cause." Negy, through counsel, requested information regarding the cause of the delay on November 3, 2020 — 152 days after the university publicly announced it had "launched an inquiry" into Negy, and 109 days after Negy had formally received a notice of investigation.

72.     On November 6, 2020, Defendant Myers wrote Negy to say that she now anticipated her investigative report would be "issued in November," with no reason given for the continued delay. She stated that she would "update [him] if that changes."

73.     November 2020 came and went with no report and no "update."

74.     On December 1, 2020, with the investigation in its sixth month, Negy again wrote to Defendant Myers to request information about the delay. He explained that "This protracted investigation is taking a terrible toll on me both personally and professionally and is causing irreparable harm to my reputation and professional opportunities," and asked for "a meaningful update on the status of this investigation."

75.     Defendant Myers responded on December 7, 2020, that "The investigation of your matter remains pending and has taken longer than initially anticipated."

76.     Negy received no further updates from Defendant Myers. However, on January 5, 2021, Negy was notified by Defendant Dupras that following "internal discussions" of his case to which he was not privy, he was being placed on administrative leave. While UCF's faculty CBA permits employees to be placed on administrative leave at the *start* of an investigation, the circumstances of UCF's sudden decision to place Negy at this stage — with opaque reference to unspecified "internal discussions" — was highly irregular, and was further evidence of Defendants' retaliation against Negy for his protected speech.

### Defendant Myers Finds Negy Responsible for Misconduct in Violation of the First Amendment

77.     On January 13, 2021 — 180 days after Negy received his notice of investigation — Defendant Myers issued her investigative report. Defendant Myers' report concluded that Negy had engaged in discriminatory harassment in the course of his classroom teaching. Defendant Myers also concluded that in 2014, Negy had failed to report inappropriate behavior allegedly committed by one of his teaching assistants.

20

78.     Defendant Myers also found that Negy — who repeatedly begged for enough information about the allegations against him to allow him to meaningfully prepare for his investigative interviews — had provided "false" information during the investigation on account of his faulty memory in a few isolated instances.

79.     Many of the alleged incidents of "discriminatory harassment" for which Defendant Myers found Negy responsible were in fact instances of speech protected by academic freedom and the First Amendment.

80.     Indeed, in an unrelated lawsuit, the U.S. Court of Appeals for the Eleventh Circuit ruled in April 2022 that UCF's "discriminatory-harassment policy likely violates the First Amendment on the grounds that it is an overbroad and content- and viewpoint-based regulation of constitutionally protected expression."

### Defendant Dupras Fires Negy Without the Required Notice, Leaving Him Homeless and Without Income

81.     Also on January 13, 2021, Defendant Dupras issued Negy a letter notifying him of the university's intent to terminate his employment at the close of business on January 25, 2021.

82.     Under UCF faculty's CBA, tenured faculty are ordinarily entitled to six months' notice of termination unless their continued presence "jeopardize[s] the safety or welfare of…students."

83.     However, Defendant Dupras determined that because Negy had once allegedly failed to report inappropriate touching by his teaching assistant in 2014, his presence on campus in 2021 would "jeopardize the safety or welfare of…students" and thus he could be terminated immediately.

84.     Defendant Dupras' letter cruelly treated Negy, who had been employed by UCF for more than 20 years, like a common criminal. She directed Negy to return any UCF property in his possession within two days or it "will be considered stolen," and informed him that before coming to campus to return said property, he would need to make prior arrangements to have an "escort" while on campus.

85.     The immediate loss of income caused by the denial of six months' notice forced Negy to rapidly sell his home at significantly below market value. This was particularly difficult because Negy had just assumed responsibility for the care of his physically and mentally disabled brother following the death of their last parent. At the time of Negy's termination, his brother had just moved from Houston to Orlando to live with Negy.

86.     Without income and now homeless, Negy and his brother were forced to move in with a relative.

87.     Negy's mental health deteriorated significantly as a result of Defendants' actions. In April 2021, he was diagnosed with Major Depressive Disorder and Generalized Anxiety Disorder after he sought treatment for

22

symptoms that began "following termination from his previous place of employment." Negy had no prior mental health history or diagnosis.

### *UCF Loses in Arbitration*

88.   On February 12, 2021, Negy notified UCF of his intent to grieve his termination as a violation of his CBA.

89.   Negy's grievance argued that UCF violated the CBA by failing to provide him with six months' notice of his termination, and by disciplining him without "just cause."

90.   On March 19, 2021, Negy and his Union-appointed attorney attended a "Step 2" grievance meeting with UCF administrators at which Negy's attorney laid out the ways in which Defendants' termination of Negy violated the terms of the CBA.

91.   Under the CBA, the UCF Board of Trustees had 30 days to respond to the information that Negy's Union attorney presented at the Step 2 meeting. Just before the 30-day deadline, Negy was notified that the Board of Trustees was requesting a 30-day extension to respond.

92.   Having already been severely damaged by the repeated delays in the investigation process that preceded his termination, Negy — through counsel — asked the Board of Trustees why they were requesting the extension.

93.     Without giving any reason, the Board of Trustees simply said they were unable to respond by the deadline.

94.     Under the CBA, Negy was therefore permitted to notify UCF of his intent to proceed to arbitration, the final stage of the grievance process. Negy submitted a Notice of Intent to Arbitrate on May 13, 2021.

95.     After multiple delays, Negy's arbitration hearing took place in March 2022.

96.     On May 16, 2022, the arbitrator issued an opinion awarding Negy "full reinstatement, with tenure, and with all compensation and benefits fully restored to that effect as of the termination date."

97.     Specifically, the arbitrator determined that UCF had not been justified in overriding the 6-month notice requirement of the CBA by deeming Negy a "safety risk."

98.     The arbitrator found that Negy had received "consistently outstanding annual evaluations" for the past two decades, until his tweets led to a "campaign by UCF" to gather potentially damaging information about his classroom behavior.

99.     The arbitrator ruled that UCF's assessment that Negy was a "safety risk," when UCF had given him no opportunity to modify his behavior, did not justify denying him the required 6 months' notice. The arbitrator was unpersuaded by UCF's attempt to "buttress its claim" that

24

Negy was a safety risk by pointing to his alleged 2014 failure to report unwanted conduct by a teaching assistant.

100.   Because the arbitrator concluded that UCF had violated the CBA by denying Negy the 6 months' notice, he did not reach the second question of whether Negy was actually responsible for the misconduct of which UCF accused him. He noted, however, that Negy's case raised issues such as "effective use of protected free speech texts" and "announcement pre-investigation that Dr. Negy was a pariah in the view of the administration."

101.   Adding insult to injury, UCF dragged its feet and took more than four months to pay Negy what he was awarded by the arbitrator in May 2022.

102.   This caused Negy to suffer additional financial hardship. Further, to his great embarrassment, he was forced to approach friends and family for loans during the period of time that UCF refused to pay him what he was owed.

103.   Although forced by an arbitrator to reinstate Negy, UCF has made clear that it believes it did nothing wrong in retaliating against and ultimately terminating him for his protected speech.

104.   UCF has never voluntarily rescinded the misconduct that led to Negy's termination. *Amalgamated Transit Union Local 1593 v. Hillsborough*

*Area Reg'l Transit Auth.*, 2019 U.S. Dist. LEXIS 102138 (M.D. Fla. June 19, 2019).

105.   As a result, Negy continues to experience a significant chilling effect on his protected speech. The teaching that was once a source of joy for him is now a source of anxiety as there is a credible threat that UCF will again subject him to the same treatment based on his protected speech.

### FIRST CAUSE OF ACTION

**Violation of Plaintiff's Right to Free Speech Under the First and Fourteenth Amendments (42 U.S.C § 1983) – Retaliation – Defendants Board of Trustees of UCF (official capacity), Butler (individually), Cartwright (individually), Johnson (individually), Dupras (individually), Myers (individually)**

106.   Plaintiff repeats and realleges paragraphs 2-5, 7-13, 22-30, 31-36, 38-41, 44-45, 51-76, 77-79, 81-87, and 103-105 of this Complaint as if fully set forth herein.

107.   Plaintiff engaged in constitutionally protected speech and has been subjected to severe retaliation as a result. Defendants' actions would deter a person of ordinary firmness from exercising their right to free speech.

108.   Within days of Plaintiff's protected tweets, Defendants Butler, Cartwright, and Johnson publicly solicited complaints about Plaintiff's classroom teaching in an effort to establish a pretextual reason for terminating him. This solicitation was posted on UCF's website under the headline "Members of UCF's leadership urge current and former students to

26

report discriminatory behavior they may have experienced from faculty and staff." The pretextual nature of Defendants' solicitation of complaints is evident both from the timing and from Defendants' contemporaneous remarks to students who were demanding Plaintiff's firing. Defendant Butler, for example, responded to the flood of #UCFFireHim tweets by posting a video to Twitter explaining that "the fact of the matter is it's not going to happen overnight." Similarly, Defendant Cartwright publicly agreed with a student protester who stated that "should have been fired before he got tenure."

109.   Also within days of Plaintiff's protected tweets, Defendant Dupras sent a message to the entire College of Sciences to inform them that "UCF leadership is aware of these tweets and are actively working to address this situation. I cannot speak to next steps until they are finalized, but I'm reaching out to let you know that the administration is moving forward." When the administration finished "moving forward," Defendant Dupras not only imposed the most severe sanction of termination, but also deliberately and maliciously deprived Plaintiff of the customary 6 months' notice of termination afforded to tenured faculty. Instead, Defendant Dupras deemed Plaintiff a danger to campus based on his alleged failure to report inappropriate behavior on the part of one of his teaching assistants in 2014, and provided him with only 12 days' notice.

110.   Defendant Myers conducted the investigation that resulted from the solicitation of complaints against Plaintiff. Her investigation was intrusive and harassing. She asked Plaintiff repetitive questions for over 8 hours. She delayed the investigation for months without explanation. When Plaintiff repeatedly asked for sufficient information about the allegations to allow him to prepare for his interviews with Defendant Myers, she denied him that information — and then used his faulty memory to add a charge of providing false information during an investigation to the list of charges against him. Further, Defendant Myers concluded that Plaintiff had violated UCF policy based on his protected classroom speech.

111.   The Board of Trustees was aware of Plaintiff's tweets and of the demands for his termination that followed. They were first informed of the controversy on June 4, 2020, in an email from UCF's Assistant Vice President for Board Relations. The Trustees were further aware of Defendants' mistreatment of Plaintiff in their solicitation of complaints, investigation, and termination, as they vigorously defended the specific actions of each Defendant in their arbitration brief.

112.   Defendants' actions have severely damaged Plaintiff.

113.   Negy was out of work for more than a year. He was forced to sell his home at a significant loss and move in with a relative in order to be able

28

to provide care and shelter for his mentally and physically disabled brother, for whom he is the sole caregiver.

114.   Negy was diagnosed with anxiety and major depressive disorder and had to seek medical treatment.

115.   Defendants have destroyed Plaintiff's reputation and rendered him virtually unemployable in his field at any institution other than UCF.

116.   Further, Defendants' actions — which they continue to defend to this day — have had a severe chilling effect on Plaintiff's speech following his reinstatement; he is fearful of teaching the controversial subjects covered in his classes for fear of additional complaints and investigations.

117.   In retaliating against Plaintiff for his protected speech, Defendants Butler, Johnson, Cartwright, Myers, and Dupras all acted in violation of clearly established law.

118.   Therefore, Plaintiff is entitled to an award of monetary damages, including punitive damages, and equitable relief.

119.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to an award of monetary damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

## SECOND CAUSE OF ACTION

**Violation of Plaintiff's Right to Free Speech Under the First and Fourteenth Amendments (42 U.S.C § 1983) – Defendants Board of Trustees of UCF (official capacity), Myers (individually)**

120.    Plaintiff repeats and realleges paragraphs 2-5, 7, 13, 64-65, 79-80, 85-87, and 103-105 of this Complaint as if fully set forth herein.

121.    Plaintiff teaches courses on psychology, culture, and sexual behavior that necessarily include discussions of sensitive subject matter.

122.    During her 8+ hours of interrogation, Defendant Myers barraged Negy with a litany of accusations spanning 15 years. Most of these allegations were simply objections to Negy's course content and pedagogy.

123.    Ultimately, many of the alleged incidents of "discriminatory harassment" for which Defendant Myers found Plaintiff responsible were in fact instances of speech protected by academic freedom and the First Amendment.

124.    Defendants' actions have severely damaged Plaintiff.

125.    Negy was out of work for more than a year. He was forced to sell his home at a significant loss and move in with a relative in order to be able to provide care and shelter for his mentally and physically disabled brother, for whom he is the sole caregiver.

126.    Negy was diagnosed with anxiety and major depressive disorder and had to seek medical treatment.

127.    Defendants have destroyed Plaintiff's reputation and rendered him virtually unemployable in his field at any institution other than UCF.

128.    Further, Defendants' actions — which they continue to defend to this day — have had a severe chilling effect on Plaintiff's speech following his reinstatement; he is fearful of teaching the controversial subjects covered in his classes for fear of additional complaints and investigations.

129.    In finding Plaintiff responsible for "discriminatory harassment" based on his germane classroom speech, Defendant Myers acted in violation of clearly established law.

130.    Therefore, Plaintiff is entitled to an award of monetary damages, including punitive damages, and equitable relief.

131.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to an award of monetary damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

## **THIRD CAUSE OF ACTION**

### **Negligence – UCF Board of Trustees (official capacity)**

132.    Plaintiff repeats and realleges paragraphs 7-13, 22, 31-36, 51-80, 81-87, 89, 97, and 99 in this Complaint as if fully set forth herein.

133.    Under Florida law, the elements of a negligence claim are (1) a duty by the defendant to conform to a certain standard of conduct; (2) a breach

31

of the duty; (3) a reasonably close causal connection between the breach and the resulting injury; and (4) actual loss or damages.

134.    Under Florida law, the state and its agencies and subdivisions can be liable for torts committed "by the negligent or wrongful act or omission of any employee of the agency or subdivision while acting within the scope of the employee's office or employment." § 786.28, Fla. Stat. (2022).

135.    Defendant Board of Trustees of UCF has a duty of at least reasonable care in the governance of UCF, including the duty that it has taken upon itself to ensure that the university complies with "laws, rules, regulations and requirements." *About the Board*, UCF.edu, https://bot.ucf.edu/about-the-board/ (last visited Jun. 28, 2023). Such a duty includes the responsibility of adopting reasonable employment practices, reasonably overseeing employees, especially those who exercise investigatory and disciplinary authority over other employees, and treating Plaintiff reasonably in particular. *See McCain v. Fla. Power Corp.*, 593 So.2d 500, 503 (Fla. 1992) ("[E]ach defendant who creates a risk is required to exercise prudent foresight whenever others may be injured as a result."); *see also Slonin v. City of West Palm Beach*, 896 So.2d 883 (4th DCA 2005).

136.    Likewise, officers, employees, or agents of UCF have a reasonable duty of care in the performance of their duties at UCF. However, "[t]he exclusive remedy for injury or damage suffered as a result of an act, event, or

32

omission of an officer, employee, or agent of the state or any of its subdivisions or constitutional officers is by action against the governmental entity, or the head of such entity in her or his official capacity, or the constitutional officer of which the officer, employee, or agent is an employee." § 768.28(9)(a), Fla. Stat.

137.    In violation of these duties, Defendants Butler, Cartwright, and Dupras made public statements implying that Plaintiff would face consequences for his constitutionally protected tweets.

138.    Defendant Butler released a video statement explaining to those demanding Plaintiff's firing that "it's not going to happen overnight." Defendant Cartwright publicly agreed with a student protester that Plaintiff "should have been fired before he got tenure."

139.    Defendant Dupras emailed the College of Sciences to state that the university "is aware of these tweets and are actively working to address this situation. I cannot speak to next steps until they are finalized, but I'm reaching out to let you know that the administration is moving forward."

140.    In violation of these duties, Defendants Butler, Cartwright, and Johnson retaliated against Plaintiff by posting a public solicitation on UCF's website inviting people to lodge complaints about Plaintiff's classroom conduct, even anonymously. They did this with the expectation that at least

some of the many students loudly demanding that Plaintiff be fired for his tweets would file complaints.

141.    In violation of these duties, Defendant Myers conducted a deliberately punitive and harassing investigation. She denied Plaintiff adequate notice of the allegations despite his repeated requests, and then when he failed to accurately recall things he had said in the classroom years ago, she charged him with providing false information during the investigation. She also subjected him to numerous unexplained delays in the investigation despite his repeated requests for information. She did this as part of Defendants' effort to penalize Plaintiff for his tweets after they generated significant negative attention and negative publicity for the university.

142.    Upon information and belief, UCF was aware of problems with Defendant Myers' job performance and ability to observe others' individual rights. However, UCF failed to adequately train or supervise Defendant Myers.

143.    In violation of these duties, Defendant Dupras terminated Plaintiff without just cause, as determined by an arbitrator on May 16, 2022.

144.    In violation of these duties, Defendant Board of Trustees failed to prevent its employees from violating Plaintiff's rights under UCF policy and the law.

34

145.    The harm to Plaintiff as a result of Defendant Board of Trustees'
negligence was entirely foreseeable.

146.    Indeed, Defendants' actions have severely damaged Plaintiff. He
was out of work for more than a year. He was forced to sell his home at a
significant loss and move in with a relative in order to be able to provide care
and shelter for his mentally and physically disabled brother, for whom he is
the sole caregiver. He was diagnosed with anxiety and major depressive
disorder and had to seek medical treatment. Furthermore, Defendants' very
public actions and denunciations have destroyed Plaintiff's reputation and
rendered him virtually unemployable in his field at any institution other
than UCF.

147.    Therefore, Plaintiff is entitled to an award of monetary damages,
including punitive damages, and equitable relief.

### FOURTH CAUSE OF ACTION

**Intentional Infliction of Emotional Distress – Defendants Myers and
Dupras (individually) or, in the alternative, Board of Trustees of
UCF (in their official capacity)**

148.    Plaintiff repeats and realleges paragraphs 7-13, 51-79, 81-87, and
88-102 in this Complaint as if fully set forth herein.

149.    Under Florida law, the elements of a claim for intentional
infliction of emotional distress are (1) the defendant's conduct was intentional

35

or reckless; (2) the conduct was outrageous; (3) the conduct caused emotional distress; and (4) the emotional distress was severe.

150. Under Florida law, the state and its agencies and subdivisions can be liable for torts committed "by the negligent or wrongful act or omission of any employee of the agency or subdivision while acting within the scope of the employee's office or employment." § 786.28, Fla. Stat. (2022).

151. Under Florida law, state employees can also be individually liable for tort violations committed in the scope of their employment when they act "in bad faith or with malicious purpose." § 786.28, Fla. Stat. (2022).

152. Defendant Myers acted in bad faith or with malicious purpose when she intentionally subjected Plaintiff to more than 8 hours of repetitive and harassing questioning. She deliberately denied Plaintiff the information he needed to prepare for that interrogation despite his repeated requests, and then used his faulty memory to charge him with providing false information during an investigation.

153. Further, Defendant Myers acted in bad faith or with malicious purpose when she allowed her investigation to drag on for months without providing Plaintiff any information about the cause of the repeated delays, despite Plaintiff begging for updates because the protracted investigation was "taking a terrible toll on me both personally and professionally."

36

154.    As a direct and proximate result of Defendant Myers' conduct, Plaintiff suffered severe emotional distress. Despite no prior history of mental illness, he was diagnosed with anxiety and major depressive disorder that required medical treatment. He was terminated from his position and deemed a danger to campus, forcing him to sell his home at a significant loss and move — along with the mentally and physically disabled brother for whom he is the sole caregiver — in with a relative.

155.    Defendant Dupras acted in bad faith or with malicious purpose when she made the decision to terminate Plaintiff — a decision that the arbitrator later overturned, finding it was without just cause.

156.    Defendant Dupras did not simply terminate Plaintiff, however. She also acted in bad faith or with malicious purpose when she intentionally and maliciously denied Plaintiff the 6 months' notice he was entitled to prior to termination. To accomplish this, she purposely distorted an inapplicable section of UCF's collective bargaining agreement that allows the university to deny the usual notice when a professor's continued employment would "jeopardize the safety or welfare of… students." Defendant Dupras claimed that because Plaintiff had allegedly failed to report inappropriate touching by one of his teaching assistants *in 2014*, Plaintiff was a threat to student safety. Instead of receiving 6 months' notice of his termination, therefore, Plaintiff received 12 days' notice.

37

157.    Defendant Dupras acted in bad faith or with malicious purpose when she further tormented Plaintiff by treating him like a common criminal, requiring him to be escorted by campus police while retrieving his belongings and informing him that any university property not returned within 48 hours "will be considered stolen."

158.    Suddenly stripped of income, Plaintiff was forced to sell his home just after he had assumed responsibility for the care of his mentally and physically disabled brother following the death of their last parent.

159.    Defendant Dupras' bad faith or malicious conduct caused Plaintiff to suffer severe emotional distress. The fear of being unable to house and care for his dependent brother caused Plaintiff profound anxiety; indeed, despite no prior history of mental illness, he was diagnosed with anxiety and major depressive disorder.

160.    Defendants' very public actions and denunciations have destroyed Plaintiff's reputation and rendered him virtually unemployable in his field at any institution other than UCF.

161.    Ultimately, unable to find adequate housing without an income, Plaintiff and his brother had to move in with a relative.

162.    Alternatively, Defendant Board of Trustees failed to prevent the Individual Defendants from wrongfully violating Plaintiff's rights under UCF policy and the law.

38

163.    Defendants' actions have severely damaged Plaintiff. He was out of work for more than a year. He was forced to sell his home at a significant loss and move in with a relative in order to be able to provide care and shelter for his mentally and physically disabled brother, for whom he is the sole caregiver. He was diagnosed with anxiety and major depressive disorder and had to seek medical treatment as Defendants destroyed his chances of securing work elsewhere.

164.    Therefore, Plaintiff is entitled to an award of monetary damages, including punitive damages, and equitable relief.

## FIFTH CAUSE OF ACTION

### Abuse of Process –Defendants Myers, Dupras, Cartwright, and Johnson (individually) or, in the alternative, Defendant Board of Trustees (in their official capacity)

165.    Plaintiff repeats and realleges paragraphs 7-13, 51-79, 81-87, and 88-102 in this Complaint as if fully set forth herein.

166.    Under Florida law, the elements of a claim for abuse of process are (1) a willful and intentional misuse of process; (2) for some wrongful or unlawful object or collateral purpose; (3) damage to the plaintiff from the defendant's actions.

167.    Under Florida law, the state and its agencies and subdivisions can be liable for torts committed "by the negligent or wrongful act or omission

39

of any employee of the agency or subdivision while acting within the scope of the employee's office or employment." § 786.28, Fla. Stat. (2022).

168.    Under Florida law, state employees can also be individually liable for tort violations committed in the scope of their employment when they act "in bad faith or with malicious purpose." § 786.28, Fla. Stat. (2022).

169.    Defendants Myers and Dupras acted in bad faith or with malicious purpose when they willfully and intentionally misused UCF's Prohibition of Discrimination, Harassment and Related Interpersonal Violence and UCF's Collective Bargaining Agreement to retaliate against Plaintiff for his expression of views on Twitter.

170.    Alternatively, Defendant Board of Trustees allowed this wrongful abuse of process to unfold over a period of seven months during which it could have intervened to require university administrators to abide by the applicable laws, rules, regulations and requirements. Defendant Board of Trustees further (unsuccessfully) defended UCF's actions in subsequent arbitration proceedings.

171.    Defendants Cartwright and Johnson acted in bad faith or with malicious purpose when they made public statements implying that Plaintiff would face consequences for his constitutionally protected tweets.

172.    Defendants Cartwright and Johnson acted in bad faith or with malicious purpose when they retaliated against Plaintiff by posting a public

solicitation on UCF's website inviting people to lodge complaints about Plaintiff's classroom conduct, even anonymously. They did this with the expectation that at least some of the many students loudly demanding that Plaintiff be fired for his tweets would file complaints.

173.     Defendants' actions have severely damaged Plaintiff. He was out of work for more than a year. He was forced to sell his home at a significant loss and move in with a relative in order to be able to provide care and shelter for his mentally and physically disabled brother, for whom he is the sole caregiver. He was diagnosed with anxiety and major depressive disorder and had to seek medical treatment. Furthermore, Defendants' very public actions and denunciations have destroyed Plaintiff's reputation and rendered him virtually unemployable in his field at any institution other than UCF.

174.     Therefore, Plaintiff is entitled to an award of monetary damages, including punitive damages, and equitable relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Charles Negy respectfully requests that the Court enter judgment against Defendants and provide Plaintiff with the following relief:

1.     A declaration that Defendants' actions violated Plaintiff's right to free speech on matters of public concern;

2.     A permanent injunction prohibiting Defendants from publicly

soliciting complaints against Plaintiff in response to his expressions of opinion on matters of public concern;

3.     A permanent injunction prohibiting Defendants from investigating or punishing Plaintiff for speech protected by the First Amendment;

4.     Monetary damages, including punitive damages, in an amount to be determined by the Court to compensate Plaintiff for the deprivation of fundamental rights;

5.     Plaintiff's reasonable attorneys' fees, costs, and other costs and disbursements in this action pursuant to 42 U.S.C. §§ 1988 and 2000e-5(k); and

6.     Such further and additional relief as the Court shall deem just, proper and authorized by law, and that the costs of this action be taxed against Defendants.

7.

## JURY DEMAND: PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS SO TRIABLE

Respectfully submitted,

Dated: June 29, 2023              /s/ David R. Osborne
                                  David R. Osborne
                                  GOLDSTEIN LAW PARTNERS LLC
                                  4651 Salisbury Rd., Suite 400

42

Jacksonville, FL  32256
610-949-0444
dosborne@goldsteinlp.com


/s/ Samantha K. Harris
Samantha Harris
ALLEN HARRIS PLLC
P.O. Box 673
Narberth, PA 19072
610-634-8258
sharris@allenharrislaw.com

*Attorneys for Plaintiff*

43