# UNIVERSITY OF CENTRAL FLORIDA
## OFFICE OF INSTITUTIONAL EQUITY

**IN THE MATTER OF:**

**COMPLAINTS FILED BY
COMPLAINANT 1
COMPLAINANT 2
COMPLAINANT 3**

**AGAINST
RESPONDENT**

# **Investigative Report**

**October 3, 2018**

MYERS R-RFP1 9757

## INVESTIGATIVE REPORT

## I.    INTRODUCTION

On Wednesday, October 18, 2017, the University of Central Florida's (UCF) Office of Institutional Equity (OIE) received a complaint from Michael Wainstein, Director of UCF's Theater program, regarding Complainant 1's (Student Complainant) allegations against Theater Professor Respondent (Respondent).   Complainant 1, who was an undergraduate student at the time, reported to Professor Wainstein that during an August 2015, Voice III class, Associate Respondent (hereafter Respondent) had her play the role of a rape victim where she (Respondent) had a male student simulate forced sex with Complainant 1 during class.  On November 2, 2017, OIE received a complaint from Complainant 2 (Student Complainant), who was an undergraduate student at the time, that she had been groped and sexually harassed at the direction of Respondent and as part of playing Benvolio in *Romeo and Juliet* in the UCF theater program.  On January 10, 2018, OIE received a complaint from Complainant 3 (Student Complainant), who was an undergraduate student at the time, that she had been forced to act out a physically intimate scene (kissing and groping) with another female student during the fall of 2017, despite the fact that Complainant 3 had a medical note that she should not be in close contact with others.

The Office of Institutional Equity (OIE) is a neutral office responsible for investigating claims of discrimination and harassment based on protected classifications, as well as retaliation. When investigations reveal the presence of discriminatory, harassing or retaliatory behavior, OIE is responsible for making recommendations to mitigate the effects of discriminatory conduct. Accordingly, OIE conducted the present investigation in response to Student Complainants' allegations. This report summarizes the Complainants' allegations, scope of the investigation, applicable standards of review, analysis and findings of OIE.

As discussed in further detail below, OIE's investigation revealed that Complainant 1 was subjected to a sexually hostile educational environment during her Voice III class when she was asked to play a rape victim with her scene partner in front of her class.  Further, while OIE found that Complainant 2 was subjected to unwanted physical touching during the production of *Romeo and Juliet*, OIE did not find that the alleged sexually harassing conduct was so severe or pervasive that it altered the terms and conditions of her educational environment.  Similarly, with respect to Complainant 3, while OIE found that Complainant 3 had been assigned a scene where she was expected to engage in intimate physical contact, Complainant 3 chose not to engage in the intimate physical contact and, therefore, was not subjected to a sexually hostile educational environment.

## II.    APPLICABLE STANDARDS OF REVIEW AND EVIDENTIARY STANDARDS

In the present case, Student Complainants claimed Respondent subjected them to Hostile Environment Harassment.  A review of the relevant University policies and regulation below provides the framework used by OIE in its analysis of Student Complainants' allegations.

The University of Central Florida's *Non-Discrimination Regulation UCF 3.001* and *Prohibition of Discrimination, Harassment and Related Interpersonal Violence Policy UCF 2-004.1* provides in relevant part:

The University does not unlawfully discriminate in any of its education or employment programs and activities on the basis of an individual's …sex, . . or membership in any other protected classes as set forth in state or federal law.

The University also prohibits employees from being subjected to hostile environment harassment which is described as discriminatory harassment that is so severe or pervasive that it unreasonably interferes with, limits, deprives, or alters the terms or conditions of education (e.g., admission, academic standing, grades, assignment); employment (e.g., hiring, advancement, assignment); or participation in a University program or activity (e.g., campus housing), when viewed from both a subjective and objective perspective. "

Sexual harassment is defined as any unwelcome sexual advances, request for sexual favors, and other unwanted conduct of a sexual nature, whether verbal, non-verbal, graphic, or otherwise, when the conditions for Hostile Environment Harassment …(as defined above) are present.[1]

**Evidentiary Principles**

The standard of proof utilized in OIE's investigations is "preponderance of the evidence," which is defined as that degree of relevant evidence which a reasonable mind, considering the record as a whole, would accept as sufficient to support a conclusion that the matter asserted is more likely to be true than not true. The burden of persuading the investigator that a decision or action was based on a protected class always rests on the complaining party and because discrimination cannot be presumed, the investigator may not find discrimination when the evidence is sharply conflicting, unclear or equivocal.

## III.    OIE INVESTIGATION

The parties were interviewed and reviewed their statements, or provided a written statement as part of this investigation.[2]  OIE received and reviewed additional documents as part of this investigation.  On November 8, 2017, Complainant 1 was interviewed by OIE and reviewed her statement and added a short addendum to her statement on December 31, 2017.  On December 1, 2017, Complainant 2 provided her written statement to OIE regarding her allegations against Respondent during the production of *Romeo and Juliet*.  On January 22, 2018, Complainant 3 was interviewed by OIE and reviewed and signed her statement on that same day.  On Wednesday, April 18, 2018, Respondent was interviewed by OIE and her Union Representative, Jennifer Sandoval, was present. Respondent signed her statement on April 23, 2018 and provided a signed ten (10) page addendum to her statement.

---

[1] These University policies and regulation are considered to provide similar protections against harassment as those afforded under the Florida Civil Rights Act of 1992 (§760.10 et seq., §110.1221), Title VII of the Civil Rights Act of 1964 (Title VII), and Title IX of the Education Amendments of 1972 (Title IX). While not a mirror image of these statutory counterparts, the examination of harassment claims under the University regulation and policies are similar to that under these relevant laws.

[2] Complainant 2 was not interviewed by OIE, but provided a seven page written statement.

## IV.  SUMMARY OF COMPLAINANT 1'S ALLEGATIONS

Complainant 1 was interviewed by OIE on November 8, 2017.  Complainant 1 stated that she had met Respondent during a tour of the Theater department in the fall of 2014. Complainant 1 took a class with Respondent during the fall 2014 semester and almost every semester thereafter. At the time of her OIE interview, Complainant 1 was an acting major and anticipated graduating in May 2018.  At all times relevant to Complainant 1's claims, Respondent was the head of the acting program at UCF and was Complainant 1's program advisor.

Complainant 1 stated that initially, she and Respondent had a student/professor relationship and that Respondent was an "admired professor."  Complainant 1 stated that she did not realize Respondent's behavior with respect to having her play a rape victim was "unacceptable" until about six months prior to her OIE interview.  Complainant 1 described Respondent as "a bit pushy," but Complainant 1 thought that was normal for an acting professor.

Complainant 1 stated that in August 2015, during the first day of the Voice III class (a Shakespeare class taught by Respondent), Complainant 1 was assigned a Monologue about sexual assault.  It was a monologue from *Measure for Measure* (Act 2 Scene 4) that is titled, *Isabella, to Whom Should I Complain?*  Complainant 1 claims the following occurred:  Respondent said to Complainant 1, "You don't really know what this monologue is about?"  Complainant 1 replied, "No, can you explain?" Respondent next told Witness 2, another student in the class and Complainant 1's scene partner, "Witness 2 stand next to ▇▇▇▇▇  Respondent then said, "Witness 2, push her down."  Witness 2 then pushed Complainant 1 onto a tile floor (no mat).  Respondent next said, "Witness 2 open her legs".  Witness 2 opened Complainant 1's legs. Respondent then told Witness 2 to keep Complainant 1 down or keep her restrained. Witness 2 held Complainant 1 down, and had her wrists pinned to the floor.  Respondent instructed Complainant 1 to fight back, but to let Witness 2 win.  Respondent then instructed Witness 2 to kiss Complainant 1's neck and cheek.[3]

According to Complainant 1, everything Respondent instructed Witness 2 to do, he did.  Complainant 1 stated that, "It was forceful because Witness 2 was playing the part of the rapist

---

[3] With respect to this incident, OIE interviewed two students who also were in the fall 2015 Voice III class, Witness 1 and Complainant 2.  Witness 1 was interviewed on September 13, 2018, and recalled that Respondent directed Witness 2 to "get her (Complainant 1) to the ground" and to "get on top of her."  She recalled that Witness 2 opened Complainant 1's legs with his legs, but she did not recall whether or not he was directed to do so by Respondent. Witness 1 also recalled that Complainant 1 started crying almost from the beginning of the scene, that the two of them remained in the position (Witness 2 on top of her with her legs spread) for a while and that the scene was forceful because it was supposed to be a rape scene. After the scene was over, Witness 1 recalled that Complainant 1 was left on the ground and asked to perform her monologue while on the ground.  Witness 1 did not recall whether Respondent instructed Witness 2 to keep her down or pin her down.

Complainant 2 was interviewed by OIE on September 19, 2018, and recalled that Respondent instructed Witness 2 to throw Complainant 1 down on the ground, to get on top of her and to spread her legs.  Complainant 2 stated that the scene was forceful because it was supposed to be a rape scene.  Complainant 2 stated that Complainant 1 was left on the ground after Witness 2 got off of her and Respondent asked her to perform her monologue.  Complainant 2 recalled that Complainant 1 was crying during her monologue. Complainant 2 did not recall whether Respondent instructed Witness 2 to keep her down or to pin her down.

and the interaction was fluid." After the scene was over, Complainant 1 stated that Witness 2 left Complainant 1 lying on the ground.[4]

Complainant 1 described that at the time that the scene from the monologue was taking place, she could not believe it was happening. She stated that the actions took place in front of the whole class and that the other students in the class were really uncomfortable. Complainant 1 stated that many students told her that they had to look away and could not watch.

Complainant 1 expressed that following the scene, the class continued as normal, but that she was sobbing hysterically. Respondent instructed Complainant 1 to perform the monologue right after this incident with Witness 2. Complainant 1 claimed that Respondent "just played it off like she [Complainant 1] was just acting really well." As far as Complainant 1 can recall, Respondent never referenced the incident again.

Complainant 1 stated that the reasons she did not report this incident until more than two years after it happened was because she did not realize at the time that what had happened was sexual harassment. Complainant 1 was nineteen (19) years old at the time of the incident, it was only her second acting class, and she thought "that is what acting was." Complainant 1 expressed to OIE that it was not until she talked to her other actor friends in the program and they pointed out that what happened to her was "not okay" that she realized what had happened to her. After Complainant 1 realized that the conduct was not okay, she was scared to report it because Respondent was her professor for at least one class a semester and she was head of the acting program. Complainant 1 stated to OIE, "She has my degree, I was nervous about making her mad."

## V.    SUMMARY OF COMPLAINANT 2'S ALLEGATIONS

Complainant 2 provided a detailed written statement to OIE on December 1, 2017. Complainant 2 stated that she initially was assigned to assist with directing *Romeo and Juliet*, but because she got a full time position performing at Disney, she had to step down from her position. Complainant 2 stated that she met with Respondent in person during the summer of 2016 and told her that her work schedule would result in having conflicts with the show rehearsals. According to Complainant 2, Respondent nevertheless offered to cast her in the show. During fall 2016 auditions, Respondent cast her in a supporting role, Benvolio, a part written for and usually played by a man.

In her direction of *Romeo and Juliet*, Complainant 2 stated that Respondent's major concern was making sure the audience understood the text and language of the play. Complainant 2 described that Respondent's method in accomplishing this for the audience was to have the actors physically demonstrate Respondent's interpretation of the text through their bodies. As Complainant 2 acknowledged in her statement, *Romeo and Juliet* was full of sexual innuendos, which meant that many of the physical interpretations by the actors were of a sexual nature.

Complainant 2 played the role of Benvolio, and expressed that he is a character written for a male who spends the majority of the stage time hanging out with other male characters. Complainant 2 explained that she and Respondent decided that she would not play this part as a man, but would rather be a female character with many male friends. Complainant 2 claimed that

---

[4] Complainant 1 stated that Respondent did not have anyone take off their clothes during the scene.

Respondent's direction for playing Benvolio included other male actors on stage demonstrating Shakespeare's sexual innuendos through Complainant 2. This included picking Complainant 2 up off the ground and spinning her around, pulling her, attempting to kiss her, grabbing or putting their face(s) in her breasts, grabbing or smacking her butt, gesturing to and putting their face(s) in her crotch, etc.  Complainant 2 stated that she was not upset about being touched in a sexual manner, but was upset that she was never asked for her consent for such actions prior to the scenes.

Complainant 2 claimed that she spoke to Respondent and told her that she did not think that these physical interactions fit the characters and that most male/female friendships didn't involve this sort of touching, especially not so often or so casually.  She stated that Respondent did not want to hear Complainant 2's comments about the touching.  Complainant 2 stated she also told Respondent that she was uncomfortable with what was happening onstage and that at the very minimum, she would like to have a warning for what would happen in the scene so that she could prepare.  However, Complainant 2 described that Respondent made it very clear that making sure that the other (male) actor could be "free" was more important than addressing Complainant 2's comfort level about the physical contact.  Complainant 2 therefore tried to deal with the situation as best she could.[5]

Complainant 2 further described that she would periodically ask one of her scene partners (the one with whom most of the touching problems would arise) if he would run what he was going to do onstage by her beforehand so she would have an idea of what to expect.  Complainant 2 expressed in her statement that she thought this was a reasonable request, but that her scene partner was concerned that Respondent wanted him to "keep it fresh."  Complainant 2 stated that she told him that she understood, but that it would make her feel more confident in her own character if she was not being constantly blindsided by what he was doing and that if they discussed their actions together so that they could make decisions as a team.  Complainant 2 stated that her scene partner continued to change up his actions every rehearsal and she was constantly on guard, feeling as though she had to block herself from unwanted physical advances. Complainant 2 indicated that Respondent also told her to "stop being so defensive." Complainant 2 described that she did not fully understanding what she was feeling or experiencing, so she tried to do what Respondent told her to do.  Once Complainant 2 was able to fully communicate her feelings about what was happening to her scene partner, she stated that he felt horrible.  Complainant 2 stated that she does not blame her scene partner for his actions during the play as he was just taking direction from Respondent.

Complainant 2 described that by February 2017, she was physically, mentally, and emotionally "decimated."  She noted that by that time the cast had been rehearsing *Romeo and Juliet* since November 2016 and it felt to her "like a warzone; it felt as though everyone was

---

[5] Complainant 1 stated in her OIE interview that she also was in the production of *Romeo and Juliet.*  When OIE asked her about the production, she stated that there were problems with the actors improvising the script, grabbing other actors' buttocks, and putting their faces in others' crotch areas.  She stated that students were groped without permission.  Complainant 1, claimed that she spoke with the stage manager, Witness 3, who graduated in 2017, and said, "Hey, can people ask before they do this?"  Complainant 1 next described that the student actors left for break and that they never had any further discussion about the issue.  Complainant 1 stated that she talked to Witness 3 after the production closed and Witness 3 told her that "it was crazy that the issue had never been addressed." Complainant 1 further stated that Witness 3 also told her that she had spoken to Respondent about the complaints and that Respondent responded, "They are at the collegiate level and they need get over it."

constantly on guard." Complainant 2 described that at about the February timeframe, Tonia Sina from Intimacy Directors International came to do a series of workshops at Theatre UCF. Complainant 2 stated that this series was "a game changer" for her in terms of understanding how the actors were supposed to be handling the physical contact that occurred during *Romeo and Juliet*. Complainant 2 described that Ms. Sina specialized in intimacy choreography for the stage and that her workshops addressed "a very new movement, one that Tonia herself actually created." Complainant 2 stated that Ms. Sina's job was to choreograph intimate moments on stage (such as touching, kissing and sexual encounters), but included advocating for the rights of the actors who are involved in portraying intimate scenes. Complainant 2 stated that she participated in Ms. Sina's workshop and listened to her explain how proper stage intimacy should be accomplished by obtaining the consent from the actor at each step in the process and never doing anything new without first discussing it with the actors. Complainant 2 stated that when she heard this, she had trouble holding back her tears. Complainant 2 stated that for the first time she was hearing that actors had *rights* and that the actors did not have to agree to do anything they did not want to do. Complainant 2 stated that this was the first time she had heard a person in her field state that actors had a right to insist upon giving consent to participate in intimate scenes. Complainant 2 described that the concept of consent resonated with her because of her contrary experiences with *Romeo and Juliet*.

Complainant 2 stated that she spoke one-on-one with Ms. Sina after the workshop. Complainant 2 stated that Ms. Sina was incredibly empathetic to her situation and gave her tips on how to create a better environment for herself in *Romeo and Juliet.* Complainant 2 claimed that she had already done most of the things Ms. Sira suggested, beginning with speaking directly to the director, Respondent. Complainant 2 stated that she told Ms. Sira that she had already expressed her concerns to Respondent on multiple occasions, but that she had been met with either a lack of solution or, at worst, downright judgment, annoyance or anger by Respondent. Complainant 2 stated that Ms. Sira expressed disappointment in hearing this, but was very understanding and gave Complainant 2 advice about working with her scene partner again to see if they could work together to find a solution.

Complainant 2 stated that after she spoke with Ms. Sira, she was hopeful that she and her scene partner could reach a common understanding at the next rehearsal, which was the Sunday before *Romeo and Juliet* opened. Complainant 2 stated that she spoke with her scene partner before they ran the show and asked if he could try doing things differently or, at the very least, could he act consistently so that she would know what to expect from him and thus let her "guard down a bit and actually be able to act." Complainant 2 described that her scene partner expressed his concerns about going against Professor's Boyd's wishes, as she had been so adamant about his character's "freeness" and "willingness to play" and had commented on how well he had "followed his impulses." Complainant 2 claims that she told him that she understood where he was coming from, but that she was uncomfortable with their scenes and that it would help her if he did something else and he agreed to try. Complainant 2 described that when she and her scene partner got to the part where he had been had been putting his face in her crotch (the moment when Complainant 2 had specifically told him to do something else -"anything else"), he tried to kiss her. Complainant 2 stated that she "freaked out" and had a "meltdown" on stage. Complainant 2 described that the way her scene partner came at her, she thought for a moment that she might fall from the second story of the set where they were performing. Complainant 2 remembered looking down onto the first floor of the set and making eye contact with her friend, Complainant 1 and,

before she knew it, she (Complainant 2) was crying. She stated that no one paused the rehearsal and the scene was completed with tears streaming down her face. Thereafter, Complainant 2 explained that she exited the stage and was rushed by people who were trying to show her support and understand what had happened. Complainant 2 described that the stage managers asked her to explain what had happened, which made her scene partner feel guilty and confused. Complainant 2 stated that she explained to her scene partner that what he had done was "*not* okay, was *not* what [they] had talked about." Complainant 2 further stated that she explained to him that she did not blame him, as he was only following the directions of Respondent. Complainant 2 stated that Respondent came back stage and asked her what had happened and asked her if she was "okay." Complainant 2 stated that she explained to Respondent about the kiss and the moment she thought she was going to fall. Complainant 2 stated that in response Respondent said, "Well, I hope you don't blame the scene partner," and continued with, "Good, he's a sweet boy and he's only doing his job. Maybe you can get together with him one on one and figure out different things for you two to do in that moment instead." Complainant 2 stated that she agreed to do as Respondent directed. She stated that Respondent next said, "You know, that was the most beautiful I've ever seen you perform. It really made the scene. You really should try to go to this place [emotionally] every night because it was beautiful to watch." Complainant 2 stated that she was both "appalled" and thought Respondent's comment was "kind of funny." Following this incident, Complainant 2 reported that her relationship with Respondent improved, but that sometimes Respondent singled her out in a negative way and made comments about her "emotional state." Complainant 2 stated that she was most concerned about the issue of consent and would like to feel comfortable, supported and safe as an actor in the UCF Theater Department.

## VI.     SUMMARY OF COMPLAINANT 3'S ALLEGATIONS

Complainant 3 was interviewed by OIE on January 22, 2018. Complainant 3 was a Stage Management Major in the Theater Department taking Acting II (Intermediate Acting) with Respondent at the time of the alleged sexually harassing incidents. Ms. Gerbach confirmed that Acting II was the only class she had taken with Respondent as of the time of her OIE interview. Complainant 3 stated there were approximately fourteen (14) students in Acting II. Complainant 3 stated that she had been suffering from a chronic condition rom approximately March 2017 or before. During September 2017, she stated she was suffering from another again from the chronic condition and that her doctor told her that she should limit her close contact with others. Ms. Gerbach stated that, in October 2017, her doctor wanted her to stop attending school for the semester and recommended that she have a medical procedure over winter break. Complainant 3 stated that she was able to finish the semester and that she had the procedure over the winter break.

Complainant 3 stated that she emailed Respondent on the dates that she needed to miss class because of her on-going illness. Complainant 3 stated that she and her scene partner, ███ had performed workshop sessions outside of class before they presented their scene to the class. Complainant 3 provided the emails to OIE where she told Respondent that she was sick and on vocal rest. Specifically, one email provided to OIE showed that, on October 9, 2017, her doctors wanted Complainant 3 to continue to be on vocal rest and should not share food, drinks or kiss anyone to lessen the possibility of reoccurrence of illness prior to her procedure.

Complainant 3 stated that she and her scene partner were assigned a scene on September I5, 2017. Complainant 3 stated that they began practicing their scene and there was a delay in

performing it because of the hurricane. Complainant 3 stated that she and her scene partner ended up performing the scene on approximately October 16, 2017. Complainant 3 stated that, in preparing for the scene, Respondent kept instructing them to follow the script direction for the two characters (a lesbian couple attending the one partner's mother's funeral). The script indicated that the characters should kiss and grope each other multiple times during the scene. Complainant 3 stated neither she nor her scene partner understood the relevancy of the kissing and groping and after Complainant 3's medical diagnosis, chose not to complete the scene with the kissing. Complainant 3 stated that the entire time she and her scene partner were rehearsing the scene, Respondent kept directing them to be more physical with each other despite having been informed of Complainant 3's medical restrictions. Further, both Complainant 3 and her scene partner communicated to Respondent that they were uncomfortable with the physical intimacy they were expected to perform. Complainant 3 stated that, because she and her scene partner chose not to kiss in the scene, this choice affected their grades for the scene. Complainant 3 stated that others in the class felt, like her, that if they did not complete the intimate physical requirements of the scene, their grades would negatively affected.

Complainant 3 stated that during Respondent's class, she observed the "non-acting major'" students, such as herself, being assigned scenes that required them to act in romantic intimate manners and that, when these students questioned the scenes and asked for explanation, they were given little guidance or instruction. Complainant 3 felt that these scenes all had components of physical intimacy that did not appear to enhance the meaning of the scene. Complainant 3 stated that she did not feel supported or safe in the class. Complainant 3 felt an uneasiness in the classroom because students were required to perform these scenes (especially with no instruction from the professor on why the physical intimacy was necessary or relevant to the scene). She also heard the experienced students talking about how awkward the class was because of what they were being asked to perform.

Complainant 3 stated that she did witness Respondent instruct student actors in the class to have physically intimate contact with their scene partner without asking that partner's permission. Specifically, she gave an example of instructing a male student to put his arms around a female student's waist and "nuzzle- kiss" her neck without asking the permission of the female student. Complainant 3 stated that the female student spoke-up and told her partner, "no" before the scene was performed.

Complainant 3 did not participate in the production of *Romeo and Juliet*. Complainant 3 stated that she is friends with Complainant 2 and that she knows Complainant 1. Complainant 3 stated that she has not witnessed Respondent with either of these students.

## VII.   SUMMARY OF RESPONDENT'S RESPONSE TO ALLEGATIONS

### Summary of Respondent's OIE Interview and Documentation Submitted to OIE in Response to Complainants' Allegations

Respondent was interviewed by OIE on April 18, 2018. Respondent also provided OIE with additional documentation. (See Appendix below.) In addition to addressing the specific allegations of the three Student Complainants, Respondent provided general information about her

teaching and acting philosophy, as well as general information about how she conducted her classes in the Theater Department.

Respondent stated that the theater faculty conducted BFA (Bachelor of Fine Arts) reviews each semester, and that would have been the time for students to bring up concerns. Although Respondent was her advisor, Complainant 1 never raised any concerns during the BFA reviews. Furthermore, Respondent stated that her syllabus for each class instructed students on how to raise concerns during the course of the class. Given her previous interaction with the Student Complainants, Respondent expressed her surprise and dismay regarding their allegations.[6]

Respondent stated that her classes began with relaxation exercises to help build trust among her students. Respondent stated that the first thing she did in class were Meisner exercises, which involved looking into each other's eyes so the students can become more comfortable with each other.[7] Respondent also stated that she had students hold hands while they sat, so they get comfortable connecting to another human being. Respondent explained that following the Meisner exercises, students worked on blocking the scene and that she gave them ideas on what she was looking for in the production of the scene.[8] She described that she and the students talked about the scene as partners for a week before they began working the scene. Respondent also described that the students dispersed to rehearsal rooms and that she floated from room to room to check in on the development of the scenes. During this rehearsal room stage, Respondent stated that she would observe to what extent the students were comfortable with touching.

When she assigned scenes and characters in her classes and plays, Respondent stated that she did not take into consideration whether actors liked each other and also stated that she did not "dump down" classes for stage managers or other non-actors in the class.

### Response to Complainant 1's allegations

Respondent stated that Complainant 1 was in several classes and two productions (*Romeo and Juliet*, a UCF production, and *26 Pebbles,* an unaffiliated, off-campus production) with her. Respondent was Complainant 1's advisor and stated that Complainant 1 had spent time in her office, but never complained about the allegations she is now making. As referenced above, Respondent stated that Complainant 1 never complained during the BFA reviews that are conducted each semester. Respondent also stated that Complainant 1 is an A student in her classes and that she might have once made a B+. According to Respondent, Complainant 1 was never in any danger of not receiving her degree and therefore, fear of not receiving her degree could not have been the reason Complainant 1 waited to make the instant complaint.

---

[6] Respondent stated that she believed that Complainant 2 and Complainant 3 may have raised the allegations in this matter because they were concerned about passing her class and had Complainant 2 failed Respondent's class, her graduation would have been delayed. In addition, Respondent stated that she believed that the Student Complainants may have been encouraged to file the current allegations by "vindictive" faculty in the Theater Department. Respondent also noted that Complainant 1 was "best buds" with Complainant 2.

[7] Sanford Meisner stated that his approach to training "is based on bringing the actor back to his emotional impulses and to acting that is firmly rooted in the instinctive. It is based on the fact that all good acting comes from the heart, as it were, and that there's no mentality to it." The Meisner technique has generally been described as a progressive system of structured improvisations for developing concentration and imagination, stimulating instincts and impulses, and achieving "the reality of doing" in performance.

[8] Blocking a scene generally refers to working out the details of an actor's moves (or choreography) in relation to the camera or audience.

Prior to having Complainant 1 in the Voice III class, Respondent had Complainant 1 in two other classes and also had her in Movement I concurrently with Voice III. Respondent stated that she had seen Complainant 1 work with male and female classmates in a very physical way, at times rolling on top of them, without complaint.

Respondent stated that Complainant 1 was exaggerating the fall 2015 incident and noted that she found out afterward that Complainant 1 did not like the male student with whom she had been paired for the scene. Respondent, however, also had seen Complainant 1 and her scene partner do physical work together without incident or raising concerns.

More recently, Respondent asked Complainant 1 if she wanted to be in the voluntary production of *26 Pebbles* and she accepted. According to Respondent, Complainant 1 knew that by participating in *26 Pebbles*, she would have to work with Respondent one-on-one. Respondent does not understand why Complainant 1 would volunteer for *26 Pebbles* considering the allegations she was making against her in this matter.

With respect to the scene that was assigned to Complainant 1 during the fall of 2015 (*Isabella, to Whom Shall I Complain?*[9]), Respondent stated that she had Witness 2, another student in the class, work with Complainant 1 to help her get to a more emotional place with the scene. Respondent stated that the scene was about a woman who had been "sexually molested." Respondent denied telling Witness 2 to push Complainant 1 down or to kiss her. She might have said, "Witness 2, do you mind getting down there with her?" Respondent stated that she probably asked Witness 2 to get on top of Complainant 1 during the scene. Respondent explained that she did not think it would be an issue for Complainant 1 as she had seen Complainant 1 do this with other students. Respondent denied instructing Witness 2 to open Complainant 1's legs, and stated that if she said anything about opening of legs, it was directed at Complainant 1 with regard to her voice.[10] However, Respondent acknowledged during her OIE interview that Complainant 1 may have misinterpreted the instruction as she was in the middle of the class exercise. Respondent affirmed that she told Complainant 1 to fight back during the scene because that is what her character, Isabella, was scripted to do in the scene. Although Witness 2 may have kissed Complainant 1, Respondent stated that she did not instruct him to do so. Respondent stated that, "sometimes actors go off instinct, so he may have done that (kiss her)." If he did kiss her, Respondent stated that she would not have necessarily said, "don't do that" because she had seen Complainant 1 kiss others in two other classes previously. Further, she stated that sometimes actors go off instinct, so he may have done that. However, Respondent could not specifically recall Witness 2 kissing Complainant 1 during this scene.

### Response to Complainant 2's allegations

Respondent knew Complainant 2 because she was a BFA acting student who acted in *Romeo and Juliet*. Respondent did not work with Complainant 2 extensively since Complainant 2 had only been in one production, but she had Complainant 2 in classes and was Complainant 2's coach for the ACTF (American College Theatre Festival) where she worked with her on a scene. Respondent stated that during the ACTF scene, Complainant 2's scene partner grabbed her breasts and Complainant 2 appeared comfortable with the physical contact in that scene. Respondent

---

[9] Act 2, Scene 4 from Shakespeare's *Measure for Measure*.
[10] Respondent explained that "opening legs" is a vocal technique to open up the breathing mechanism.

stated that Complainant 2 knew about the sexual content played by her character, Mercutio (sic)[11], prior to the start of rehearsals in *Romeo and Juliet.*

Respondent described the production of *Romeo and Juliet* as a bridge show, meaning it covered two semesters with a break in rehearsals over winter break. Students received either a performance or production credit for their participation in the show. Respondent estimated that there were thirty (30) students in the production and stated that it was a very "physical" show. Respondent also described that every part of the show had to be "worked on" so that the production was safe and eventually comfortable for the actors. Respondent noted that this safety and comfort did not happen on the first day or week of the rehearsals, as the process involved working through scenes and that the "scenes got cleaner so everyone knew what they are doing."

Respondent stated that in *Romeo and Juliet*, Mercutio (sic) was known for his colorful sexual language and that all the actors "goofed around" as they tried to clean up the scene. She stated that Complainant 2 might have "felt more vulnerable as a woman, but no one singled her out to try to make her the butt of everyone's jokes." Respondent also stated that Complainant 2 did not like and was uncomfortable with her male scene partner and that impacted the scene, "so her comfort level was not what it could have been."

Respondent noted (and provided documentation to support) that Complainant 2 was often late to rehearsals due to her employment at Disney. Respondent stated the cast and crew had to rework the rehearsal schedule so that Complainant 2 could rehearse her scenes.

Respondent stated that Witness 4, Assistant Director and Victim Services Advocate, never talked to her about concerns regarding on-stage behavior, specifically with regard to Complainant 2. On Wednesday, February 7, 2018, Witness 4, however, sent Respondent an email which outlined her discussion with Complainant 2 regarding the events that occurred during the rehearsal where Complainant 2 thought she might fall. (See Appendix) Witness 4 stated that during tech rehearsal, she and Complainant 2 went to the lobby to work with ███ on physicality. Witness 4 asked Complainant 2 what had happened on stage to cause her to panic and Complainant 2 explained that ███ had grabbed her suddenly throwing her off balance and the thought of ███ ███ her. Witness 4 advised that anytime they were on the balcony, they needed to be cautious about their physical interactions and "no surprises." Witness 4 outlined for Respondent in the email that "it seemed the uncomfortableness working with ███ throughout the process seemed to be his lack of consistency with physical interactions." She further stated, "[t]hough I admire [h]is (sic) bold choices on stage, I understand how this can make his scene partner uncomfortable." Witness 4 had them agree on certain physical interactions that "felt comfortable for both parties and would be consistent for every time the scene was performed." Witness 4 also stated that "███ has a habit of letting himself get carried away in a scene" and "he needs to practice communication with his scene partner."

### Response to Complainant 3's allegations

Respondent stated that she knew Complainant 3 because she was a BFA stage management student and Complainant 3 took Acting II: Intermediate Acting during the fall of 2017, which is a required course for stage managers. Respondent explained that during this class, Complainant 3

---

[11] Complainant 2 stated that she played Benvolio in *Romeo and Juliet*. Benvolio was a friend of Mercutio in the play.

was assigned a scene called, "Dancing in the Afternoon," which Respondent claimed was not a sexually intimate scene and contained no kissing or groping. (Respondent stated that the scene involved one female partner comforting her wife after her mother had just passed away). Complainant 3's scene partner was ███████ ███████ (also a stage management student) and after they were assigned "Dancing in the Afternoon," Complainant 3 informed Respondent on November 1, 2017 about her medical restrictions. Respondent stated that she told the two of them that they did not need to kiss and that they could show intimacy by holding hands, stroking a cheek or other similar actions.

Respondent stated that she told both Complainant 3 and her scene partner at the two outside rehearsals, to "do what they felt comfortable doing in the scene." Respondent also stated that she would never require a student to kiss or grope unless they had done intimacy building and developed trust in rehearsal leading up to a show.

Because of Complainant 3's complaints and due to her medical situation, Respondent stated that she "worked hard" to find Complainant 3 another scene (between a brother and a sister) for the final so that she did not have to be intimate with her partner. Complainant 3 received a grade of B- on the performance of her scene and Respondent stated that her grade was not based on her failure to kiss her scene partner.[12] (See Appendix, Grading Rubric for Complainant 3.[13]) Respondent adamantly stated that there were multiple scenes presented in class where partners received good grades who did not kiss.

## VIII.  <u>STATEMENT OF MATERIAL FACTS NOT IN DISPUTE</u>

### <u>With respect to Complainant 1</u>

1. Complainant 1 was asked to play the victim in a sexual assault scene during her Voice III class with Respondent when she was nineteen (19) years of age.

2. The sexual assault scene took place on the classroom floor with no mat.

3. The sexual assault scene took place in front of the entire class.

4. Respondent asked scene partner Witness 2 to get on top of Complainant 1 while demonstrating the sexual assault scene during class.

5. Respondent instructed Complainant 1 to "fight back" once her scene partner Witness 2 was on top of her.

6. Complainant 1's scene partner Witness 2 kissed Complainant 1 during the scene.[14]

---

[12] Previously, Complainant 3 received a D on her performance of an assigned monologue in the Acting II class. Thus, as a BFA student, she was in danger of failing the class if she did not improve her grade as anything less than a C was considered by the department to be a failing grade.

[13] The Grading Rubric for Ms. Gerbach, which was prepared by Respondent, is detailed and one and one-half pages in length. The detailed rubric does not reference any lack of physical or intimate contact as a basis for Respondent's constructive criticism or for the grade she received (80 out of 100 points).

[14] Respondent acknowledged during her OIE interview that Complainant 1's scene partner Witness 2 may have kissed her, that "sometimes actors go off instinct," but that she did not instruct him to do so.

7. Complainant 1 was sobbing hysterically following the scene and had to perform her monologue.

8. Other students told Complainant 1 following the scene that they had to look away and could not watch the scene.

## With respect to Complainant 2

1. Complainant 2 volunteered to participate in the production of Shakespeare's *Romeo and Juliet.*

2. Shakespeare's *Romeo and Juliet* is a play that is replete with sexual innuendo.

3. Shakespeare's *Romeo and Juliet* is a play that required physical interaction between the actors.

4. Complainant 2 played the part of a traditionally a male character during the production of *Romeo and Juliet.* The parties agreed that Complainant 2 would play her character as a female during the UCF production of *Romeo and Juliet.*

5. Complainant 2's scene partner in *Romeo and Juliet*, as well as other actors, were permitted to improvise rehearsal and performance scenes with Complainant 2 which resulted in them touching her in various private and non-private places on her body.

6. Respondent did not choreograph or specifically instruct the actors on how to physically interact with Complainant 2 during rehearsal or on stage.

7. Complainant 2 attempted to talk to and work with her scene partner regarding how he planned to physically interact with her during rehearsal and on stage.

8. Complainant 2 did not object to being touched in a sexual manner, but objected to not being asked for consent prior to being touched.

9. Complainant 2 was upset and started crying during one rehearsal of *Romeo & Juliet* because, among other things, she felt like she might fall from the second floor stage after her scene partner grabbed her in a way he had not done before and tried to kiss her.

10. On Wednesday, February 7, 2018, ██████ ██ Assistant Director and Victim Services Advocate, sent Respondent an email which stated, in part, that Complainant 2 was upset in the rehearsal because her scene partner grabbed her suddenly and threw her off balance and that his "lack of consistency with physical interactions" seemed to be causing the issues between the two of them.

**With respect to Complainant 3**

1. Complainant 3 was in Respondent's Acting II class during the fall of 2017.

2. Complainant 3 was a stage management major.

3. Complainant 3 objected to participating in acting scenes that involved kissing or other physical contact, at least in part, because of her medical condition and recommendations from her doctor that she avoid close contact with other people.

4. Complainant 3 informed Respondent of her medical conditions.

5. Complainant 3 and her scene partner chose not to kiss during the performance of their assigned scene in Acting II.

6. Complainant 3 received a B- on her final performance of the scene she performed in Acting II.

IX.    **MATERIAL FACTS IN DISPUTE & RESOLUTION OF DISPUTED MATERIAL FACTS**

OIE received differing accounts as to some material facts. Since the questions are material to the resolution of whether Respondent violated University regulation and policies, OIE must resolve the disputed facts based on the testimonial and documentary evidence.

OIE has identified five factors to consider when resolving disputed issues of fact that require credibility assessments: 1) the inherent plausibility of the testimony; 2) the demeanor of the person offering the testimony; 3) whether the individual has a motivation to lie; 4) whether the remarks could be corroborated; and, 5) whether the respondent has a history of similar behavior. None of these factors are necessarily determinative of credibility. Courts have recognized that in a case of alleged discrimination/harassment which involve close questions of credibility and subjective interpretation, the existence of corroborative evidence or lack thereof is likely to be crucial.

OIE's investigation revealed that the following facts, which are material to determining whether Respondent violated the University regulation and policies, are in dispute:

**With respect to Complainant 1**

1. Whether Respondent instructed scene partner Witness 2 to push Complainant 1 down to the floor.

Complainant 1 stated in her OIE interview that Respondent first asked scene partner Witness 2 to stand next to her and then instructed him to push her down. Respondent stated that she did not tell scene partner Witness 2 to push Complainant 1 down, but that she might have said, "Witness 2 do you mind getting down there with her?" OIE finds Complainant 1's account more

credible as she stated that her scene partner Witness 2 was first asked to stand next to her in preparation for pushing her down. Further, Respondent acknowledged that she "probably asked Witness 2 to get on top of Complainant 1," after the two were on the ground and that she told Complainant 1 to fight back. This admission demonstrates that Respondent was not opposed to directing students to engage in forceful physical interaction with each other without first discussing those interactions with the students. Furthermore, witnesses Witness 1 and Complainant 2 recalled that Respondent instructed Witness 2 to get Complainant 1 to the ground or to throw her to the ground. As a result, OIE finds that the preponderance of the evidence demonstrates that Respondent instructed scene partner Witness 2 to push Complainant 1 down.

2. Whether Respondent directed scene partner Witness 2 to "open her [Complainant 1's] legs."

Complainant 1 stated that during her scene when she and Witness 2 were on the floor, Respondent instructed, "[Witness 2] open her legs" and that he complied and opened her legs. Respondent stated in her OIE interview that if she said anything about opening of legs, it was directed to Complainant 1 about her voice. However, Respondent further stated that Complainant 1 may have misinterpreted the instruction regarding "opening of legs" as she was in the middle of the exercise. Furthermore, witness Complainant 2 recalled that Respondent instructed scene partner Witness 2 to open Complainant 1's legs. OIE finds that regardless of the intent of Respondent's instructions regarding the "opening of legs," the preponderance of the evidence, including corroboration by Complainant 2, demonstrates that the statement was made by Respondent and reasonably interpreted by Complainant 1 and her scene partner Witness 2 as an instruction to open Complainant 1's legs.

3. Whether Respondent instructed scene partner Witness 2 to hold Complainant 1 down or keep her restrained.

Complainant 1 stated that Respondent instructed her scene partner Witness 2 to keep her down or keep her restrained while he was on top of her on the floor, and that her scene partner Witness 2 had her wrists pinned down to the floor. While Respondent did not respond directly to this allegation, she admitted that she likely told scene partner Witness 2 to get on top of her (which would pin her down) and told Complainant 1 to fight back. In addition, witness Witness 1 recalled that scene partner Witness 2 was on top of Complainant 1 with her legs spread for a while and that Complainant 1 had started crying. OIE finds Complainant 1's thorough and step-by-step account of the incident credible and, when coupled with the acknowledgement by Respondent that she likely told scene partner Witness 2 to get on top of her and for Complainant 1 to fight back, as well as Witness 1's recollection that the two stayed in the position of him on top of her with her legs spread for a while, that the preponderance of the evidence weighs in favor of finding that Respondent instructed scene partner Witness 2 to keep Complainant 1 down or keep her restrained.

<u>**With respect to Complainant 2**</u>

While there are factual differences between Complainant 2's statement to OIE and Respondent's response to the Complainant 2's allegations, OIE does not find that there are any disputed issues of *material* fact. In this regard, many of the allegations made by Complainant 2

were of events that occurred outside of Respondent's observation.

### With respect to Complainant 3

1.  Whether the scene Complainant 3 was assigned by Respondent in Acting II contained
    kissing or breast touching.

Complainant 3 claimed that the script she and her scene partner were assigned in Acting II
specified that the characters should kiss and grope each other multiple times.   Respondent stated
that she assigned Complainant 3 a scene called, "Dancing in the Afternoon," and that it was not a
sexually intimate scene and contained no kissing or groping.   Respondent also stated that she told
Complainant 3 and her scene partner that, "they did not need to kiss," and "they could show
intimacy by holding hands, stroking a cheek or other similar actions."   Respondent further stated
that she also told them they could do what they felt comfortable doing in the scene.   Finally,
Respondent stated that she "worked hard" to find another scene (between a brother and a sister)
for the final so that Complainant 3 did not have to be intimate with her partner.

Although Respondent stated that the scene assigned to Complainant 3 did not contain
kissing or groping, both Complainant 3's and Respondent's statements about the scene as
described above reflect that kissing and other physical contact was discussed when rehearsing the
scene.[15]   Therefore, OIE finds that the preponderance of evidence demonstrates that the scene
assigned to Complainant 3 contained intimate physical interaction with her scene partner, such as
kissing and breast touching.

2.  Whether Respondent instructed students to have intimate physical contact with their scene
    partners without asking the partners' permission, including when Respondent instructed a
    male student to put his arms around a female student's waist and "nuzzle-kiss" her neck
    without asking permission of the female student.

Complainant 3 alleged that Respondent instructed students to have intimate physical
contact with their scene partners without asking the partners' permission.   Complainant 3 stated
that students in the class talked about how uncomfortable they felt about being asked to engage in
scenes of intimate physical contact.   Specifically, Complainant 3 recalled an incident where
Respondent allegedly instructed a male student to put his arms around a female student's waist
and "nuzzle-kiss" her neck without first asking permission of the female student.   Complainant 3
also stated that the female student "spoke-up" and "told her partner, 'no' before the scene was
performed."   Respondent stated that she would never ask students to engage in intimate physical
contact without first engaging in intimacy building work, such as Meisner exercises (looking into
each other's eyes) and other relaxation exercises.

OIE finds that Complainant 3 credibly recalled this specific incident that occurred in her
class and also noted that the female student "spoke-up" and said, "no" to her scene partner "nuzzle-

---

[15] A review of the scene notes for *Dancing in the Afternoon* found at
http://www.theatrehistory.com/plays/dancing_in_the_afternoon.html, indicated that there is kissing and breast
touching in the scene.

kissing" her.  Further, OIE found that similar physical conduct occurred in other classes with other students (such as the incident described above involving Complainant 1).  OIE therefore finds that the preponderance of the evidence supports a finding that Respondent instructed students to engage in intimate physical contact without express permission from the student beforehand, such as touching a female student's waist, putting an arm around a female student and nuzzle-kissing her neck.

3.   Whether Complainant 3's grade for the scene was negatively affected because she did not engage in intimate physical contact with her scene partner.

Complainant 3 stated that she felt like her grade in Acting II would suffer if she did not participate in the intimate physical contact with her scene partner. She also stated that she and her scene partner "chose not to complete the scene with the kissing."  Prior to the performance of this scene with her partner, Complainant 3 had received a grade of 'D' on her monologue and was in danger of not passing the class.  Respondent demonstrated that Complainant 3 received a B- on her performance with her scene partner and stated that Complainant 3's grade was not based on her failure to kiss her scene partner.  Respondent credibly stated that there were multiple scenes presented in class where partners received good grades who did not kiss.  The detailed Grading Rubric provided to OIE by Respondent supports her statements that lack of intimate physical contact did not impact Complainant 3's grade as she provided a detailed explanation for why Complainant 3 received eight (80) points out of one hundred (100) points on the assignment. Furthermore, both Complainant 3 and Respondent stated that Complainant 3 was majoring in stage management (not acting) and Respondent credibly stated during her OIE interview that she does not "dumb down" her classes for non-acting majors.

Based on the foregoing, OIE finds that the preponderance of the evidence demonstrates that Complainant 3 ultimately was not required to engage in intimate physical contact for her assigned scene.  Complainant 3 received a better than passing grade of B-, which was a marked improvement over her prior grade of 'D' on her monologue.   OIE finds that there is insufficient evidence that Complainant 3's grade for the scene was negatively affected by her failure to engage in intimate physical contact during the assigned scene.[16]

## X.    ANALYSIS

As was set forth above, in analyzing a claim of hostile environment sexual harassment, OIE is guided by UCF 3.001 and UCF policy 2-004.1 which prohibits discriminatory harassment… based upon an individual's …sex…or membership in other protected classes set forth in state or federal law that interferes with that individual's educational opportunities, participation in a University program or activity, or receipt of legitimately-requested services meeting the description of Hostile Environment Harassment.  In order to prevail on a hostile environment claim, the evidence must show both that the harassment was discriminatory (i.e., based on sex) and that the harassment was sufficiently severe or pervasive to alter the conditions of the complainant's educational environment. Harassment that is neither sexual nor gender-based cannot constitute

---

[16] Complainant 3 identified witnesses not interviewed by OIE. Based upon Complainant 3's and Respondent's statements, the intimacy (kissing) involved in the initial scene assignment was not in dispute. Therefore, it was unnecessary to interview additional individuals in reference to this portion of the complaint.

sex-based or sexual harassment.  To establish a hostile environment sex-based claim, the complainant must show that "but for the fact of her sex, she would not have been the object of the harassment.  Proving the existence of a hostile educational environment also involves showing both objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive educational environment, and the complainants must also subjectively perceive that environment to be abusive.

When assessing the severity or pervasiveness of the conduct, discriminatory harassment claims must be analyzed on a case-by-case basis, by looking at the totality of the circumstances, including, but not limited to: 1) The frequency, nature and severity of the conduct; 2) Whether the conduct was physically threatening; 3) The effect of the conduct on the complainant's mental or emotional state; 4) Whether the conduct was directed at more than one person; 5) Whether the conduct arose in the context of other discriminatory conduct or other misconduct; 6) Whether the conduct unreasonably interfered with the complainant's educational or work performance and/or University programs or activities; and 7) Whether the conduct implicates concerns related to academic freedom or protected speech. A hostile work environment can be created by pervasive conduct or by a single or isolated incident, if sufficiently severe. The more severe the conduct, the less need there is to show a repetitive series of incidents to prove a hostile work environment, particularly if the conduct is physical. An isolated incident, unless sufficiently severe, does not amount to hostile environment harassment.

### <u>With respect to Complainant 1</u>

<u>Issue</u>:  Whether Respondent subjected Complainant 1 to a sexual or sex-based hostile environment that was so severe or pervasive that it altered the terms and conditions of her educational environment when Respondent instructed Complainant 1's scene partner to push her down, get on top of her, pin her down, and open her legs without her prior consent during a scene in which Complainant 1 was playing the role of a victim during a sexual assault and the scene took place in front of the entire class. .

OIE finds with respect to the allegations made by Complainant 1, Respondent subjected her to a sexually hostile environment that was so severe or pervasive that it altered the terms and conditions of her educational environment.  While it is rare that a single incident rises to the level of a sexually hostile environment, the Equal Employment Opportunity Commission (EEOC) and several courts have found that a single *physical* incident may constitute unlawful harassment, if it is sufficiently severe.[17]  The fact that Complainant 1 was physically restrained at the direction of Respondent in front of the entire class while a sexual assault was acted out on top of her and could not readily object[18] or escape the situation weighs heavily in favor of finding a sexually hostile educational environment.[19]  In addition, Complainant 1 stated that "she could not believe it was

---

[17] <u>See, e.g.</u>, *EEOC Policy Guidance on Sexual Harassment*, 8 FEP Man. (BNA) at 405:6689 (Mar. 19, 1990) (A single unusually severe incident, particularly if physical, may constitute actionable harassment).

[18] For purposes of its analysis, OIE recognizes that there is an inherent imbalance of power between Complainant 1 as a student and Respondent as the instructor, especially when the scene was being acted out in front of the entire class and given that Complainant 1 stated that she did not know in advance what the scene entailed.

[19] <u>Barrett v. Omaha Nat'l Bank</u>, 584 F. Supp. 22, 35 FEP Cases 585 (D. Neb. 1983, <u>aff'd</u>, 726 f.2d 424, 33 EPD ¶ 34,132 (8th Cir. 1984) (one incident constituted sexual harassment – the harasser talked to plaintiff about sexual activities and touched her in an offensive manner while they were inside a vehicle from which she could not escape.)

happening," other students told her that they were very uncomfortable and had to look away, and
she was sobbing hysterically following the scene. These statements not only support a finding that
the harassment was severe, but also that it was both subjectively and objectively offensive, as well
as threatening, humiliating, and intimidating.[20]

**With respect to Complainant 2**

**Issue**: Whether Respondent is responsible for subjecting Complainant 2 to a sexually
hostile educational environment when she permitted Complainant 2 to be touched by her scene
partner during the production of *Romeo and Juliet*.

OIE finds with respect to the allegations made by Complainant 2, Respondent did not
subject her to a sexually hostile environment that was so severe or pervasive that it altered the
terms and conditions of her educational environment. In Mendoza v. Borden, 195 F.3d 1238 (11th
Cir. 1999), the court noted that the totality of the circumstances and the context in which the
alleged harassing behavior occurred must be considered:

> Physical contact, for example, can occur in many different contexts in the
> workplace. It may be accidental, innocent, or actionable depending on how it
> occurred or whether and what kind of other acts the plaintiff alleges as well as the
> social context of the particular workplace. As Justice Scalia explained in Oncale,
> Title VII's objective standard requires careful consideration of the *social context*
> (emphasis supplied) in which particular behavior occurs and is experienced by its
> target. A professional football player's working environment is not severely or
> pervasively abusive, for example, even if the coach smacks him on the buttocks as
> he heads onto the field – even if the same behavior would reasonably be
> experienced as abusive by the coach's secretary (male or female) back at the office.
> The real social impact of workplace behavior often depends on a constellation of
> surrounding circumstances, expectations, and relationships which are not fully
> captured by a simple recitation of the words used or the physical acts performed.
> (Oncale, 523 U.S. at ---, 118 S. Ct. at 1003).

Turning to the present matter, Complainant 2 voluntarily played the part of Benvolio in the
production of *Romeo and Juliet* where she acknowledged that she knew the play was filled with
sexual innuendo. Although she objected to not being asked first, she knew that while playing
Benvolio, she would be subjected to physical interactions of a sexual nature, and indicated that she
was not opposed to being touched in a sexual manner. Also, although Respondent was alleged to
have encouraged the actors to be "free," unlike Complainant 1's matter, Respondent did not
instruct the scene players to touch Complainant 2 in a specific matter. With respect to the incident
where Complainant 2 stated that she asked her scene partner to do something other than put his
face in her crotch ("*anything* else"), he complied and kissed her instead. A review of the totality
of the circumstances and the social context in which the actions occurred does not support a finding
that the conduct was severe or pervasive. Furthermore, although the unexpected kiss which caused
Complainant 2 to panic, lose her balance and believe that she might fall from the second floor

---

[20] *See, e.g.*, Gupta v. Fla. Bd. Of Regents, 212 F.3d 571 (11th Cir. 2000) (whether conduct was threatening,
humiliating or intimidating should be considered in determining whether the conduct was severe).

landing of the stage was likely dangerous and could understandably upset Complainant 2, it was not a sexually harassing incident of such severity that it altered the terms and conditions of her educational environment.

Notwithstanding this finding, the evidence presented by Complainant 2 raises concerns regarding unwelcome, yet intended, physical contact of a sexual nature without prior consent.[21] In light of this conduct, OIE recommends that the Theater Department review its policies and practices regarding physical contact between actors, especially contact of a sexual nature, to ensure that proper protocols consistent with current legal precedent, as well current academic and industry practice, are in place.

With respect to both Complainant 1 and Complainant 2, OIE's factual findings regarding Respondent's actions require a serious response from University administration. OIE respectfully recommends that the Theater Department, in close collaboration with Academic Affairs, considers a range of sanctions intended to mitigate the harm caused by Respondent's conduct described herein and to prevent its recurrence.

**With respect to Complainant 3**

**Issue**: Whether Respondent subjected Complainant 3 to a sexually hostile academic environment during her Acting II class.

OIE finds with respect to the allegations made by Complainant 3, Respondent did not subject her to a sexually hostile academic environment during her Acting II class. Although OIE found that her assigned scene included intimate physical contact, such as kissing and breast touching, Complainant 3 stated that she and her scene partner "chose to complete the scene without kissing." Therefore, Complainant 3 did not have to engage in intimate physical contact in order to participate in the class or to receive a grade of B- on her scene. In addition, Complainant 3 alleged that the other students felt uncomfortable with being asked to engage in physically intimate contact. However, she described, in addition to her own refusal to engage in kissing, that another female student "spoke-up" and said "no," to her scene partner engaging in intimate physical contact with her. As a result, OIE finds that, while there is evidence that at least some of the scenes in the Acting II class contained intimate physical contact between the scene partners, the atmosphere of the class was such that the students could reasonably object to participating in such scenes and that such objection did not adversely affect their ability to complete the class or receive a favorable grade.

In addition, OIE finds that the conduct complained of by Complainant 3 was not so severe or pervasive that it altered the terms and conditions of the educational environment. Unlike the situation described above by Complainant 1, the intimate physical contact complained of by

---

[21] Complainant 2 stated that she did not realize the nature of her uncomfortableness with how she was treated during the production of *Romeo and Juliet* until she attended a workshop conducted by Tonia Sina from Intimacy Directors International that occurred about the same time as the production of *Romeo and Juliet* was ending in February 2017. During this workshop, Complainant 2 realized that her issue with her scene partner in *Romeo and Juliet* was because the physical touching of a sexual nature had occurred without her consent. Following this workshop, Complainant 2 came to believe that the physical touching of a sexual nature should be choreographed and consented to in advance of the scene being rehearsed or performed.

Complainant 3 (groping and kissing) is not sufficiently severe or pervasive to constitute a sexually hostile educational environment. In this situation, as opposed to the one described by Complainant 1, Complainant 3 and her scene partner had notice of the content of their scene prior to being asked to perform the scene in front of the class. Further, while OIE acknowledges that the conduct complained of by Complainant 3 might have made many of the students in the class feel uncomfortable or awkward, there is no evidence that Respondent *required* students to engage in intimate physical contact in order to complete the class. As a result, OIE finds that Complainant 3 was not subjected to a sexually hostile educational environment.

## XI.  SUMMARY OF FINDINGS

After carefully reviewing the testimonial and documentary evidence, and in light of the evidentiary principles discussed in this report, OIE makes the following findings:

1. Respondent subjected Complainant 1 to a sexually hostile educational environment in Respondent's Voice III class.

2. Respondent did not subject Complainant 2 to a sexually hostile educational environment during the production of *Romeo and Juliet*.

3. Respondent did not subject Complainant 3 to a sexually hostile educational environment behavior while taking Acting II.

OIE would remind all parties of their obligation pursuant to the University's Reporting Misconduct and Protection from Retaliation Policy (UCF-2-700), which strictly prohibits retaliation "against anyone who, in good faith, reports misconduct, or who participates in an investigation of misconduct." See also UCF-3.001 (Non-Discrimination Regulation) and UCF-2-004.1 (H) (Non-Discrimination Policy) regarding prohibitions on retaliation.

## XII.  APPENDIX: DOCUMENTS/SOURCES REVIEWED DURING INVESTIGATION

1. Emails from ▮▮▮▮ to Respondent regarding medical restrictions, dated October 3, 2017 – October 13, 2017 (not allowed to share food, drinks, or kiss anyone, dated Monday, October 9, 2017).
2. Email to Respondent from ▮▮▮▮ ▮▮ dated January 31, 2018 regarding Complainant 2 and scene partner ▮▮
3. Grading Rubric for Complainant 3 prepared by Respondent.
4. Email from Complainant 2 dated October 31, 2017, regarding journal entries.
5. Camera Syllabus from Respondent's Class – late journal submissions not accepted.
6. Rehearsal Reports #21 - #31, dated January 15 - 27, 2017, from Witness 3 demonstrating that Complainant 2 was late to rehearsals.
7. Monologue *Isabella, to Whom Should I Complain, William Shakespeare, Measure for Measure*.
8. OIE notes of October 18, 2017, conversation with Michael Wainstein regarding report received from Complainant 1.