**UNIVERSITY OF CENTRAL FLORIDA**
**OFFICE OF INSTITUTIONAL EQUITY**

**IN THE MATTER OF:**

**OIE CASE # 2023-01616**

<u>**Investigative Report**</u>

**May 14, 2024**

MYERS R-RFP1 11958

I.      **INTRODUCTION**

On February 8, 2024, an anonymous report was submitted to UCF's IntegrityLine (IL) wherein an unidentified student who identifies as Jewish alleged that the Respondent, a faculty member who identifies as Muslim, subjected the student to two antisemitic comments during a discussion on February 6, 2024.[1] This information was shared with UCF's Office of Institutional Equity (OIE), which is the office designated to review and respond to allegations of unlawful discrimination or harassment. Due to the student's decision not to share their identity and the limited nature of the incident, OIE referred the matter to management to share the allegations with Respondent, provide her with an opportunity to respond to the concerns raised, and instruct her to not engage in further discussions with students regarding the Middle East conflict and instead limit discussions to the subject matter of her course. Management also was advised to remind Respondent of her obligation not to engage in retaliation in response to the report. In addition, through the IL portal, the University offered the reporting student the option to relocate to another section of the course for the remainder of the semester. The reporting student did not pursue this option.

On March 8, 2024, OIE received a complaint from Complainant alleging that on the previous day (March 7, 2024), Respondent retaliated against him for previously submitting the anonymous IL complaint described above and subjected him to additional antisemitic comments. Complainant provided his name with this complaint. That same day, OIE made outreach to Complainant and initiated its investigation. On April 11, 2024 (while OIE's investigation of the March 8th complaint was pending), Complainant alleged that Respondent retaliated against him again when she refused to allow him to obtain credit on a quiz after he arrived late to class, and allegedly pointed her phone camera towards him while speaking with her niece during a Facetime call.

OIE conducted the present investigation to assess the issues raised by the three complaints (2/8/24 IL complaint, 3/8/24 IL complaint, and 4/11/24 OIE complaint). This report summarizes the Complainant's allegations, scope of the investigation, applicable standards of review, analysis and findings of OIE. As is discussed in further detail below, OIE finds that Respondent's conduct on March 7, 2024 was insubordinate to the direction provided by her supervisor on February 14, 2024, violated the non-retaliation provisions of UCF's *Nondiscrimination Policy* and violated the *UCF Employee Code of Conduct*. The record does not support finding that Respondent subjected Complainant to hostile environment harassment in violation of UCF's *Nondiscrimination Policy* and *Nondiscrimination Regulation*. The record also does not support finding that Complainant was subjected to retaliation related to the April 11, 2024 quiz. Lastly, on April 23, 2024, Complainant took the final exam in Respondent's course. Complainant raised concerns about access to the review for this exam and the administration of the exam. OIE attempted to meet with Complainant on April 24, 2024 to further discuss these

---

[1] UCF's IL is a secure reporting system administered by an independent third party, NAVEX Global, that is available 24 hours a day for 365 days a year. NAVEX Global uses their case management system, EthicsPoint, to provide individuals (who may be reluctant to report suspected misconduct through university administrative offices) a way to report with complete anonymity. IL reports are processed by EthicsPoint and sent to the University Compliance and Ethics Office (UCE). Where reports contain allegations of unlawful discrimination or harassment, UCE forwards those to the Office of Institutional Equity for further review and to address as appropriate.

1

concerns. However, in light of Complainant's travel plans, this meeting did not take place. OIE remains available to discuss these concerns with Complainant at a later date if he wishes to do so. Accordingly, this report will not further discuss or analyze the concerns raised related to the exam.

## II.   APPLICABLE STANDARDS OF REVIEW & EVIDENTIARY STANDARD

In the present case, OIE investigated whether Respondent violated UCF's *Nondiscrimination Regulation UCF 3.001* and *Nondiscrimination Policy*, which prohibit unlawful discrimination, harassment and retaliation in any of its programs and activities on the basis of an individual's ethnicity, national origin, religion, or any other protected classes as set forth in state or federal law.[2] The standard of proof utilized in OIE's investigations is "preponderance of the evidence," which is defined as that degree of relevant evidence which a reasonable mind, considering the record as a whole, would accept as sufficient to support a conclusion that the matter asserted is more likely to be true than not true.

## III.   MATERIAL FACTS NOT IN DISPUTE

OIE's investigation revealed that the following facts, which are material to determining whether Respondent violated the University regulation and/or policy, are not in dispute based on the testimonial and/or documentary evidence:

1. During the 2024 Spring semester, Complainant was a student in PHY 2049C – 0002 General Physics Using Calculus II, and Respondent was the instructor for this course. The class met on Thursdays from 2:00pm to 4:50pm, and began meeting on January 8, 2024. Prior to the 2024 Spring semester, Complainant had not previously taken a course with Respondent.
2. On February 6, 2024, Complainant approached Respondent to discuss a word that Respondent used in class that was used in both the Arabic and Hebrew languages. The conversation then transitioned to discussing the conflict in the Middle East involving Israel and the Gaza Strip. During the conversation, Respondent used the term "occupied territories" when referring to Israel.
3. On February 8, 2024, Complainant filed an anonymous IL complaint alleging that Respondent had subjected him to antisemitic comments during their February 6th discussion. A copy of the IL report was shared with OIE on February 9, 2024.
4. On February 9, 2024, OIE's Director contacted Respondent's supervisor (Witness 6) about the IL allegations and requested a meeting, which took place on February 12, 2024. At that meeting, OIE's Director recommended that Witness 6 speak with Respondent, learn more about the incident, and provide guidance on expectations related to interactions with students, including not discussing the conflict in the Middle East and limiting discussions to the course

---

[2] This University policy and regulation are considered to provide similar protections against unlawful discrimination, harassment and retaliation as those afforded under the Florida Educational Equity Act (§1000.05), Florida Civil Rights Act (§760.01, et seq.), and Title VI of the Civil Rights Act of 1964, which includes protection based on a student's actual or perceived shared ancestry or ethnic characteristics, or citizenship or residency in a country with a dominant religion or distinct religious identity. While not a mirror image of these statutory counterparts, the examination of unlawful discrimination, harassment and retaliation claims under the University regulation and policy is similar to that under these relevant laws.

material. OIE's Director also requested that Witness 6 remind Respondent of her obligations under the University's nonretaliation policies.

5.  On February 14, 2024, Witness 6 met with Respondent and discussed her February 6, 2024 interaction with Complainant.

6.  On March 7, 2024, following the conclusion of instruction, Complainant and Respondent again had a conversation wherein the Middle East conflict was discussed. Complainant and Respondent continued the discussion outside of the classroom while walking downstairs. During this discussion, Respondent expressed that she was unhappy that he filed an IL complaint and advised Complainant that, instead, he should have had a conversation with her.

7.  Video evidence from the March 7, 2024 class showed the Complainant walk to and from the front of the classroom. However, it is unclear if Complainant or Respondent spoke at this point. While Complainant was on his way back to his seat, Respondent appears to have spoken as Complainant turned around in her direction. Complainant then walked over to talk with a female student (Witness 7). There are three students [Complainant, a male student (Witness 3 or 4), and Witness 7] at a round table at this time. Respondent then walked over toward the group, where she was engaged with one or more of them for approximately 15 minutes. During this timeframe, Complainant and Respondent talked to each other for a majority of this time and there was hand gesturing by both Complainant and Respondent. At the end of the conversation, Respondent returned to the front of the classroom and Complainant turned to leave the classroom. It appears that Respondent called out to Complainant as he turned around and waited while she packed up her belongings. Both Complainant and Respondent then walked towards what appears to be the classroom exit.

8.  On March 7, 2024, Complainant reported his concerns about the March 7th interaction with Respondent to staff in the President's Office. That same day, Complainant also filed a second IL report wherein he used his name and reported concerns about the March 7th interaction. On March 8, 2024, this information was shared with OIE. That same day, OIE's Director shared these allegations with Witness 6.

9.  On March 11, 2024, Witness 6 met with Respondent to discuss Complainant's allegation of retaliation. During this discussion, Witness 6 instructed Respondent to limit her discussions with students to the subject matter of the course (Physics).

10. On March 12, 2024, March 13, 2024, and April 3, 2024, OIE offered Complainant the option to transfer to another section of the course under a new instructor. Complainant declined each of these offers.

11. On April 11, 2024, Complainant arrived almost 30 minutes late to class (video evidence revealed that Complainant arrived at 2:28 pm). When Complainant arrived, Witness 1 handed Complainant a paper and what appears to be a ruler. Complainant returned the paper and ruler at 3:55 pm. However, it does not appear that Complainant used either item during this time.

12. On April 11, 2024, Respondent did not allow Complainant to submit and receive credit for a quiz given during this class.

13. Video evidence from the April 11, 2024 class showed that at approximately 3:20 pm, Respondent picked up her phone from the podium, which was located at the front of the classroom, and pointed the screen of the phone in the direction of her face. At this time, Complainant was seated at a round table also located at the front of the classroom. Respondent then walked around the table where Complainant was seated still holding the phone in the direction of her face. She did not make any movement at this time pointing the phone at Complainant. Respondent then walked toward the back of the classroom and spoke with another

MYERS R-RFP1 11961

student, while still holding the phone. After speaking with the student, Respondent exited the classroom for a brief period of time and re-entered the classroom still holding the phone in the direction of her face. Respondent continued to talk to students located at the back of the classroom while holding her phone with the screen pointed in the general direction of her face. Witness 1 then approached Respondent and engaged in a brief conversation. Respondent then walked to the front of the classroom passing behind Complainant and again made no movement towards pointing the phone in Complainant's direction. Respondent engaged with several other students at the front of the classroom away from Complainant (still holding her phone). Respondent then walked in the direction of the back of the classroom, passed behind Complainant's back, and stopped in the middle of the room looking at her phone. The Complainant was behind her with his back facing Respondent. It's unclear if her phone was capturing him as she appeared to turn around in a slow manner capturing the classroom as a whole. Respondent then spoke with a student for a short period of time and followed him back toward the front of the classroom where she engaged in a longer discussion with that student and Witness 2. Respondent then walked behind the desk that was located at the front of the classroom and sat down. She then stood up, still on her phone, and walked toward the podium holding the phone in the direction of her face. She paused multiple times while walking to and from the podium, including in the area where Complainant was sitting. Respondent then walked towards the back of the classroom still holding up her phone and spoke with multiple students. She then returned to the front of the classroom and turned off her phone at approximately 3:27 pm.

## IV.     MATERIAL FACTS IN DISPUTE AND RESOLUTION OF FACTS

OIE received differing accounts as to multiple material facts. Accordingly, OIE must resolve the disputed facts based on the testimonial and documentary evidence. Before discussing each disputed material fact below, it is important to note that courts have recognized that in a case which involves close questions of credibility and subjective interpretation, the existence of corroborative evidence or lack thereof is likely to be crucial.

**1.     Whether, during the February 6th discussion, Respondent said Arabic was "a higher quality language" than Hebrew.**

In his initial IL report, Complainant alleged that on February 6, 2024, he approached Respondent after she used a word in Arabic that was similar to a word in Hebrew. Complainant described the initial part of the conversation as friendly until she claimed that Arabic was "a higher quality language" than Hebrew. When asked by OIE about this discussion, Respondent denied that she said Arabic was "a higher quality language." Respondent explained that she had used the term "khalas," which is Arabic for "done," to place the students on a break. During the break, Complainant approached her and asked about the term "halla." She then explained to Complainant that Arabic and Hebrew were related as they are both Semitic languages, and that Arabs and Jews that speak those languages both have a common heritage. Respondent then recommended a documentary which shows the overlap of Arab Jews.

Both parties agreed that there were no witnesses to this particular discussion. Therefore, no one could corroborate either party's version of what occurred during this discussion. Taking

4

the record as a whole into consideration, OIE finds that there is insufficient evidence that Respondent stated that Arabic was "a more quality language" than Hebrew.

### 2. Whether, on February 14, 2024, Witness 6 instructed Respondent to limit her discussions with students to the subject matter of the course (Physics).

Respondent confirmed that she had a meeting with her supervisor (Witness 6) on February 14, 2024, wherein they discussed Complainant's allegations related to their February 6th discussion. She stated that, during this meeting, Witness 6 did not specifically tell her to limit her discussions with students to the subject matter of the course (Physics) and to refrain from discussing the subject matter of the allegations with students. Rather, she recalled that Witness 6 instructed her to "keep her distance" from students in terms of having personal conversations. However, Witness 6 stated to OIE that during the February 14th meeting with Respondent, he discussed the allegations related to the February 6th discussion between Respondent and Complainant, and specifically instructed Respondent that she should keep the topic of conversations with students related to the class material. He further explained that her conversations with students hold more weight due to the power differential between instructors and students. Witness 6 acknowledged that Respondent appeared frustrated by this meeting, but stated that Respondent appeared to understand that she should keep the topic of conversations with students related to class material. Witness 6 also recalled that during this meeting, Respondent said that she identifies as a scientist and should be able to talk about evidence outside the subject matter of the course, and Witness 6 reiterated that she should not do this with students. There were no witnesses to this discussion. However, OIE spoke with Witness 6 in advance of this meeting and advised Witness 6 to instruct Respondent to limit her discussions with students to the subject matter of the course (Physics). OIE requested that this meeting take place prior to the next class to prevent a continuation of the prior discussion between Complainant and Respondent.

Taking the record as a whole into consideration, including the purpose of the meeting, the intentional scheduling of the meeting prior to the next class to prevent further incidents, and the consistency between OIE's recommendation to Witness 6 and Witness 6's description of the meeting, OIE finds that there is sufficient evidence that on February 14, 2024, Witness 6 instructed Respondent to limit her discussions with students to the subject matter of the course (Physics).

### 3. Whether, during the parties' March 7th discussion, Respondent referred to Complainant as a "troublemaker."

Complainant alleged that on March 7, 2024, Respondent approached him in the presence of other students at the end of the class and directed the following comment towards him, "You are a troublemaker." Complainant allegedly asked Respondent what she was talking about, Respondent replied, "You know," and Complainant stated that he did not know what she was talking about. Complainant alleged that he thought Respondent was trying to make him look "dumb" in front of the other students. Complainant also thought Respondent was trying to make him stop reporting concerns he had about their discussions.

MYERS R-RFP1 11963

Witnesses 3, 4, 5, and 7 were present when Complainant and Respondent talked at the end of the March 7th class. Witness 3 stated to OIE that they were not involved in the conversation, but it did not appear to them that either Respondent or Complainant was agitated during the discussion. Witness 3 did not know what specifically was discussed and only recalled that the discussion appeared to be about a topic that they did not agree on. Witness 3 could not confirm or deny that Respondent used the term "troublemaker." Witness 4 stated to OIE that on March 7th, they were talking with Respondent, Complainant, and Witness 7 about physics.[3] At some point, the conversation switched to the Middle East conflict, but they were unsure who changed the topic. Witness 4 opined that Respondent was calm during the discussion while Complainant appeared upset. Witness 4 did not recall the specifics of the conversation related to the Middle East. However, Witness 4 did recall Respondent referring to Complainant as a "troublemaker" in a joking manner, which Witness 4 did not perceive as being said in a negative way. Witness 5 recalled that there was a discussion between Respondent and Complainant pertaining to religious beliefs surrounding the Middle East conflict but could not recall any specifics comments of the conversation, including whether Respondent used the term "troublemaker."

Respondent stated that she did not think she used the term "troublemaker" when speaking with Complainant; however, she did acknowledge that she referenced that Complainant got her "in trouble." Specifically, Respondent recalled that she asked Complainant "why he did not talk to her directly instead of getting her in trouble." Respondent explained that her concern "was not about him filing a report as such, only that I see it as a waste of time for all parties."

Taking the record as a whole into consideration, in particular the corroboration by Witness 4 of the use of the term "troublemaker" and Respondent's acknowledgement of referring to her getting in "trouble," OIE finds that there is sufficient evidence that during the parties' March 7th discussion, Respondent referred to Complainant as a "troublemaker" in reference to his initial IL complaint while in the presence of other students.

**4. Whether, during the March 7th discussion, Respondent told Complainant that she did not believe that Israelis were subjected to rape or sexual assaults by Hamas on October 7, 2023.**

Complainant alleged that during their March 7th conversation, Respondent said she did not believe that rapes or sexual assaults happened on October 7, 2023 as reported in the news. Complainant informed Respondent of a United Nations' report that confirmed that sexual assaults occurred on October 7, 2023. Complainant said Respondent did not seem to care and responded, "As a scientist, I need proof." Complainant then shared his opinion that the United Nations' report was proof and she disagreed.

As set forth above, Witnesses 3, 4, 5, and 7 were present for the March 7th discussion. However, Witness 7 did not participate in OIE's investigation and the other witnesses did not have a specific recollection of the comments made between the parties about the Middle East conflict, including whether Respondent denied that Israelis were subjected to sexual assault on October 7, 2023. Respondent recalled their March 7th discussion but denied that she said Hamas

---

[3] Despite multiple outreaches from OIE to Witness 7, they did not respond or participate in this investigation.

had not engaged in rapes or assaults. She explained to OIE that there is no denying that this took place, whether someone wants to believe this or not. Respondent acknowledged that their discussion included her wanting to talk with Complainant about the conflict as a scientist, but not in the context of her denying that sexual assaults had occurred. Rather, she suggested pulling away from thinking about these events as a Muslim or Jewish person, and instead having an open mind because "not everything is black and white."

Taking the record as a whole into consideration, OIE finds that there is insufficient evidence establishing that Respondent told Complainant that she did not believe that Israelis were subjected to rape or sexual assault by Hamas on October 7, 2023. None of the witnesses were able to corroborate either parties' version of this discussion, and Respondent acknowledged rape having occurred on October 7, 2023.

**5. Whether, during the March 7th discussion, Respondent denied that Israel was the homeland of the Jewish people, denied that Jewish and Hebrew artifacts had been found in Israel, and denied the presence of the holy temple where the current Al-Aqsa Mosque stands.**

Complainant alleged that during the March 7th discussion, he told Respondent that Israel is the homeland of the Jewish people and that ancient Jewish and Hebrew artifacts had been found all over Israel, which she denied. Respondent also allegedly denied the presence of the holy temple where the current Al-Aqsa Mosque stands.

As set forth above, Witnesses 3, 4, 5, and 7 were present for the March 7th discussion, but could not corroborate the specific comments made between the parties about the Middle East conflict, including whether Respondent denied the items as described above by Complainant. When asked about these allegations during her OIE interview, Respondent explained that she did not deny that Israel was the homeland of Jewish people. Rather, she explained to Complainant that she had been taught in Iraq that Israel was called "the occupied territory." Respondent also explained that she did not deny the existence of the holy temple under the Al-Aqsa Mosque or the existence of Jewish and Hebrew artifacts in Israel. Rather, Respondent told Complainant that, as a scientist, she did not have knowledge and proof of their existence. Respondent explained that she tried repeatedly to address topics that Complainant brought forth (such as those described above) but was unable to respond to many of the topics because he talked over her. Respondent perceived that Complainant did not appear to want her opinion on the topics, but only to provide her with his narrative. Respondent explained to OIE that she was trying to express her opinion, but she does not expect everyone to believe the same things.

Taking the record as a whole into consideration, OIE finds that there is insufficient evidence to establish that during the March 7th discussion, Respondent denied that Israel was the homeland of the Jewish people, denied that Jewish and Hebrew artifacts had been found in Israel, and denied the presence of the holy temple where the current Al-Aqsa Mosque stands.

MYERS R-RFP1 11965

**6. Whether, during the March 7th discussion, Respondent stated, "I don't care about Hamas."**

Complainant alleged that Respondent felt strongly about the loss of innocent Palestinian life, and when he explained that one of the leading causes of this is that Hamas holds these innocent people at gunpoint and puts them in harm's way, she replied, "I don't care about Hamas." Complainant interpreted this discussion as Respondent indirectly suggesting that the Israel Defense Forces is "mindlessly murdering innocent civilians" in the Gaza Strip.

As set forth above, Witnesses 3, 4, 5, and 7 were present for the March 7th discussion, but were unable to corroborate the specific comments made between the parties about the Middle East conflict, including whether Respondent said, "I don't care about Hamas." During her OIE interview, Respondent recalled this part of the discussion differently than Complainant. Respondent recalled that Complainant claimed that all the Palestinians who were killed were terrorists. Respondent explained to Complainant that she is Iraqi and is not associated with Hamas. She further explained that she does not care for any group, regardless of affiliation, if they carry guns and cause death to others. Respondent further told Complainant that the death of Palestinians hurts her, and she does not want to see anyone die.

Taking the record as a whole into consideration, including that none of the witnesses were able to corroborate either parties' version of this discussion, OIE finds that although Respondent referenced not caring for any group that carries guns and causes death, there is insufficient evidence that Respondent stated, "I don't care about Hamas" in the context described by Complainant.

**7. Whether, on April 11, 2024, Respondent shouted, "No, don't give it to him" when Witness 1 handed out graphing paper and a ruler to Complainant.**

Complainant alleged that when he arrived to class late on April 11, 2024, Respondent shouted, "No, don't give it to him," when Witness 1 handed him graphing paper and a ruler whereas Respondent normally talked in a calm voice. During his OIE interview, Witness 1 corroborated that after he gave Complainant the graphing paper and ruler, Respondent said, "No, don't give it to him." However, Witness 1 denied that Respondent shouted this statement. Rather, she spoke in a "normal voice" while utilizing a microphone as she was about to review the quiz with the class. Witness 1 also indicated that he left the items with Complainant to use for the remainder of class, and Respondent did not give him further instructions in this regard. Witness 2, who was present in the class and located at the front of the classroom, did not even hear Respondent say Complainant was not taking the quiz and did not hear her shout anything. Witnesses 3 and 4 said they heard Respondent tell the class that everyone who came in late would not be able to receive credit for the quiz. Respondent did not appear to be talking about Respondent specifically but in a generalized manner to the whole class. Witnesses 3 and 4 stated that Respondent spoke in a normal tone and did not shout.

Respondent acknowledged that she said not to give the material to Complainant but denied that she shouted this. OIE's review of the video evidence for this class also did not show any students react to Respondent telling Witness 1 not to allow Complainant to take the quiz

(thereby, corroborating that she did not shout). Taking the record as a whole into consideration, including the lack of corroboration by witnesses, OIE finds that there is insufficient evident that Respondent shouted, "No, don't give it to him."

**8. Whether, on or after April 11, 2024, Respondent allowed other students who were late to the April 11th class to receive credit for a quiz given on that day.**

Complainant alleged that on April 11, 2024, he arrived approximately 30 minutes late to class and was not permitted to receive credit for a quiz given on that day. He alleged that Respondent allowed other students who arrived late to receive credit for the quiz. Respondent agreed that Complainant was not permitted to take and receive credit for the quiz, but stated that other students who were late on April 11th also was not permitted to receive credit for the quiz. Witness 1, who was the Learning Assistant, and Witness 2, who was the Graduate Teaching Assistant, both confirmed that any student who arrived late during the April 11th class was not permitted to receive credit for the quiz. Both confirmed that multiple students arrived late that day and received a zero for the quiz. Witnesses 3 and 4 shared that they also heard Respondent tell the class that anyone who arrived late would not receive credit for the quiz.

Taking the record as a whole into consideration, OIE finds that there is insufficient evidence that Respondent allowed other students who were late to the April 11th class to receive credit for a quiz given on that day. Rather, the record demonstrates that all students who were late to class on April 11, 2024, including Complainant, received a zero for the quiz. Accordingly, Complainant was not treated differently with regard to the quiz at issue.

**9. Whether, on April 11, 2024, Respondent pointed her phone at Complainant and pointed him out to the individual on the Facetime call.**

Complainant alleged that on April 11, 2024, Respondent was on a Facetime call with her niece during classroom instruction and intentionally pointed her camera at him to show her niece. Although Respondent acknowledged that she answered a Facetime call on April 11th, she denied that it was during classroom instruction (claiming that it was during a break) and denied pointing the phone at Complainant to show the caller. Respondent stated that, at most, Complainant's back might have been visible to her caller. Witness 1 confirmed that Respondent took a phone call while in the classroom but stated that the call was taken during a break. Witness 1 observed Respondent walk around the class while she was on the call, and had some tables wave to the caller. Witness 1 did not see Respondent focus the phone on Complainant or Respondent point out Complainant to the caller. Witness 2 also observed Respondent on the phone during a break in class. Witnesses 2 and 3 similarly did not see Respondent direct her phone toward Complainant or point him out to the caller. However, Witness 4 stated that they noticed Respondent on her phone and it appeared that she showed Complainant to the caller on the phone as she walked past Complainant.

As set forth in detail above, OIE reviewed video of the incident, which demonstrated that Respondent was on her phone for approximately seven (7) minutes. Based on no one leading the class on instruction during that time, it appeared to have taken place during a break (which was confirmed by Witnesses) rather than during class instruction as alleged by Complainant. For the

9

majority of the seven minutes, Respondent was not near Complainant. Rather, she walked around the classroom away from Complainant's table and interacted with multiple students, and even sat down behind the front desk area for a short period of time. As Respondent walked around, she held the phone toward the direction of her face. She did not appear to be hovering near or around Complainant nor did she encroach or come close to encroaching on his personal space at any point with the phone. For a majority of the time, the phone was not located at an angle that could capture his face (in other words, to the extent he was visible, the majority of the time it would have captured his back). Near the end of the call, Respondent walked in front of where Complainant was sitting and paused briefly, which understandably may have been an opportunity to capture Complainant from the front if that was Respondent's intent. However, Respondent proceeded to walk and pause multiple times in this sequence and thus not focused on any particular student. It also was unclear from the video whether the camera was directed out away from the phone or at the person holding the phone (selfie manner) during this time. Accordingly, taking the record as a whole into consideration, OIE finds that there is sufficient evidence that Respondent answered a phone call on April 11, 2024 during a break in class. However, OIE finds that there is insufficient evidence that Respondent pointed her phone at Complainant and pointed him out to the individual on the Facetime call.

## <u>V.</u>     <u>ANALYSIS</u>

### Hostile Environment Harassment

Complainant alleged that Respondent created a hostile environment based on his Jewish identity by subjecting him to antisemitic statements. To begin, in analyzing a claim of hostile environment harassment, OIE is guided by UCF's *Nondiscrimination Policy* (No. 2-004), which prohibits unlawful harassment based upon an individual's protected class(es) as set forth in state or federal law that interferes with that individual's educational opportunities, participation in a University program or activity, or receipt of legitimately-requested services meeting the description of *Hostile Environment Harassment*. In order to prevail on a hostile environment harassment claim, the evidence must show both that the harassment was based on a protected class (i.e., ethnicity, national origin, religion)[4] and that the frequency and severity of the alleged harassing conduct effectively denies an individual's ability to participate or benefit from their education when viewed from a subjective and objective perspective.

In addition to Title VI of the Civil Rights Act of 1964, when reviewing claims of antisemitism, OIE's assessment is guided by Fla. Stat. §1000.05, which prohibits discrimination against students and employees in the Florida K-20 public education system. Section (8) of this law requires educational institutions to "treat discrimination by students or employees or resulting from institutional policies motivated by anti-Semitic intent in an identical manner to discrimination motivated by race." For purposes of this law, "anti-Semitism" includes a "certain perception of the Jewish people, which may be expressed as hatred toward Jewish people, rhetorical and physical manifestations of anti-Semitism directed toward a person, his or her property, or toward Jewish community institutions or religious facilities." Equally important,

---

[4] Title VI of the Civil Rights Act of 1964's protection from discrimination based on race, color, or national origin extends to students who are or are perceived to be Jewish, Muslim, Hindu, or Sikh, or based on other shared ancestry or ethnic characteristics.

MYERS R-RFP1 11968

when there are allegations related to faculty speech, OIE must assess whether the speech occurred during class and, if so, whether those in-class comments are protected under the doctrine of academic freedom.[5] Similarly, when there are harassment allegations related to speech, OIE may need to assess whether the speech is protected by the First Amendment.[6] Fla. Stat. 1000.05 acknowledges these legal doctrines in section (8)(c), which states that "[n]othing in this subsection shall be construed to diminish or infringe upon any right protected under the First Amendment to the United States Constitution, or the State Constitution."

Turning to the present matter, OIE substantiated that the two alleged antisemitic discussions did not take place during class. One discussion took place during a break (February 6, 2024), and the other occurred after class ended while students were leaving the classroom and in the hallway outside the classroom (March 7, 2024). Accordingly, the academic freedom doctrine does not apply as the substantiated comments did not take place during classroom instruction.

As to the specific discussions, OIE substantiated that on February 6, 2024, Complainant approached Respondent to discuss a word that Respondent used in class that was used in both the Arabic and Hebrew languages. The conversation then transitioned to discussing the conflict in the Middle East involving Israel and the Gaza Strip. During the conversation, Respondent used the term "occupied territories" when referring to Israel. OIE also substantiated that on March 7, 2024, Complainant and Respondent had a conversation wherein the Middle East conflict was discussed again despite having been instructed by her supervisor on February 14th not to engage on this topic with students. During this discussion, Respondent referred to Complainant as a "troublemaker" in reference to his initial IL complaint in the presence of other students; told him that she was unhappy that he filed an IL complaint; and, advised Complainant that, instead of filing the complaint, he should have had a conversation with her. Respondent also acknowledged that, during this discussion, she explained that she had been taught in Iraq that Israel was called "the occupied territory." However, OIE did not substantiate Complainant's other allegations of specific comments which he believed were antisemitic (i.e., Arabic was "a more quality language" than Hebrew, Israelis were not subjected to rape by Hamas on October 7, 2023, Israel was not the homeland of Jewish people, etc.).

For purposes of this analysis only, OIE assumes, without deciding, that using the term "occupied territories" or "occupied territory" in reference to Israel constitutes antisemitism and does not fall within the protection of the First Amendment. However, in applying the applicable legal framework and definition of hostile environment harassment as described above, although Complainant found his interactions with Respondent upsetting, the record lacks evidence of Respondent subjecting Complainant to protected class behavior with such frequency and severity that it effectively denied Complainant's ability to participate in or benefit from his education. Accordingly, OIE finds that the Respondent did not subject Complainant to hostile environment

---

[5] "Academic freedom, though not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment." *University of California Regents v. Bakke*, 438 U.S. 265 (1978). It consists of "the right of an individual faculty member to teach ... without interference from ... the university administration, or his fellow faculty members." *Dow Chemical Co. v. Allen*, 672 F.2d 1262, 1275 (7th Cir. 1982) (citations omitted).
[6] The First Amendment protects a public employee's right to speak as a citizen addressing matters of public concern as "a citizen who works for the government is nonetheless a citizen." *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006).

11

harassment in violation of UCF's *Nondiscrimination Policy* or *Nondiscrimination Regulation*. However, Respondent's March 7th conduct fell short of professional expectations as set forth in the University's *Code of Conduct* as she was insubordinate to the direction provided by her supervisor on February 14, 2024. Respondent's March 7th conduct also constituted retaliation in violation of the *Nondiscrimination Policy* and *Nondiscrimination Regulation* as set forth more fully below.

### Retaliation

Retaliation means any adverse action taken against a person for making a good faith report of unlawful discrimination or harassment, or participating in or being a party to any proceeding under the *Nondiscrimination Policy*. An adverse action is conduct that would discourage a reasonable person from engaging in activity protected under this policy. To establish a *prima facie* claim of retaliation, the evidence must demonstrate that a complainant (1) engaged in protected activity that the respondent was aware of, (2) experienced a materially adverse action, and (3) there is a causal connection between the adverse action and the protected activity. Should these three components be substantiated, the burden then falls to the respondent to demonstrate a legitimate, nonretaliatory purpose for the adverse action. The analysis then turns to whether the rationale provided by the respondent is a pretext for retaliation

Turning to the present matter, Complainant alleged that Respondent subjected him to retaliation as follows: (1) March 7, 2024 discussion about Complainant being a "troublemaker" and how he should not have filed the IL complaint; and (2) Complainant not being permitted to earn credit on a quiz when he arrived to class late on April 11, 2024. As to the first incident, OIE finds that the first element of a *prima facie* claim is satisfied in that the Complainant engaged in a protected activity by submitting the February 8, 2024 IL complaint, and Respondent became aware of this activity during her February 14, 2024 meeting with Witness 6. OIE finds that the second element is satisfied by Respondent confronting Complainant about the prior complaint and calling him a "troublemaker" in front of his peers at the end of class. OIE finds that this conduct would discourage a reasonable person in the Complainant's circumstances from reporting concerns of this nature to the University. Moreover, Respondent making this comment in front of Complainant's peers likely could have a chilling effect on not only Complainant, but other students who might have overheard Respondent. With respect to the third prong, Respondent was made aware of the protected activity on February 14, 2024 and confronted Complainant on March 7, 2024, approximately three weeks later, which is sufficient to establish the causal connection due to temporal proximity between the events. When asked about this incident, Respondent explained to OIE that the purpose of speaking with Complainant on March 7, 2024 about the complaint was her attempt to have Complainant talk to her about concerns rather than submitting further complaints (which she perceived as a waste of others' time). Therefore, Respondent did not provide a legitimate, nonretaliatory reason for confronting Complainant about the complaint and referring to him as a "troublemaker" in front of his peers. Accordingly, OIE finds that Respondent subjected Complainant to retaliation in violation of UCF's *Nondiscrimination Policy*.

As to the second incident of alleged retaliation, the elements of a *prima facie* claim are satisfied in that the Complainant engaged in a protected activity (2/8/24 and 3/7/24 IL

MYERS R-RFP1 11970

complaints), Respondent was aware of this activity (2/14/24 meeting with Witness 6 and receipt of 3/13/24 Notice of Investigation from OIE), Complainant was subjected to an adverse action (zero on a quiz), and there is a causal connection due to the temporal proximity between the protected activity and adverse action. Respondent provided a legitimate, nonretaliatory reason for the zero – namely, Respondent arrived to class approximately 30 minutes late. Turning to whether this was pretextual, the record demonstrated that this action was not directed at Complainant alone. Instead, all students who arrived late received a zero on the quiz. With no evidence that this was pretext for retaliation, OIE finds that the April 11, 2024 incident did not constitute retaliation.

OIE would remind all parties of their obligation pursuant to the University's *Reporting Misconduct and Protection from Retaliation Policy* (UCF-2-700), which strictly prohibits retaliation "against anyone who, in good faith, reports misconduct, or who participates in an investigation of misconduct." *See also* UCF-3.001 (Nondiscrimination Regulation) and UCF-2-004 (Nondiscrimination Policy) regarding prohibitions on retaliation.

MYERS R-RFP1 11971