|  |  |
|---|---|
| In the Matter of the Arbitration | OPINION |
| Between | AND |
| University of Central Florida Board of Trustees | AWARD |
| And | Ben Falcigno, |
| The United Faculty of Florida | Arbitrator |
| (Grievant: Dr. Charles Negy) |  |

Pursuant to the collective bargaining agreement (cba) between the above-captioned parties, The undersigned was designated as Arbitrator to hear and decide a dispute over the disciplinary action of termination taken against Dr. Charles Negy, the grievant.

Hearings in the matter were held on March 8, 9, 10 and 17, 2022, in the offices of the University of Central Florida (UCF) in Orlando. The United Faculty of Florida (UFF) was represented by H.B. Stivers, Esq., and UCF by M. Mattimore, Esq. and by M. Sugarman, Esq. Both parties were afforded full opportunity to introduce evidence, examine and cross-examine witnesses, and to make argument. The hearing was deemed closed on May 13, upon receipt of briefs.

STIPULATED ISSUES FOR ARBITRATOR

Whether the University violated Article 16.7 of the Collective Bargaining Agreement by failing to provide Dr. Negy with the requisite 6 month notice without making the requisite findings; and if they did make such findings, did the University fail to document same and/or provide Dr. Negy with proper notice; and if so, then there must be a determination of the relief due grievant.

Whether there was just cause to discipline Grievant based on the allegations of the Notice Letter in accordance with the terms and conditions of the Collective Bargaining Agreement. If Grievant is found not to have engaged in the alleged misconduct subject to discipline, or if the termination was not appropriate discipline, then there must be a determination of the relief due Grievant.

PRIMARY RELEVANT CONTRACTUAL PROVISIONS

Dr. Negy was charged with violations of UCF regulations regarding non-discrimination, harassment and related interpersonal violence by creating a hostile learning environment for students; violations of the obligation to allow students to file complaints about his classroom conduct; discouraging a student from reporting an incident of alleged sexual assault by one of his Teaching Assistants; and violation of policy requiring honesty and integrity, by providing false information to the university during the university's investigation of him. In summary, the charges all represent alleged misconduct.

The cba provides that a unit employee is required to "Observe the regulations of the University, provided they do not contravene the provisions of this Agreement..." (cba Art 5.3 (g)).

With respect to limitations on the right to discipline, UCF agreed that ..."A tenured appointment or any appointment of definite duration may be terminated during its term for just cause" (cba Art 16.7). Misconduct is the offense in this case against which the just cause standard is to be applied (cba Art 16.2). Additionally, "Both parties endorse the principle of progressive discipline as applied to professionals..." (cba Art. 16.3).

The term "progressive discipline" is not otherwise specifically defined.

ELABORATION OF THE TERMS *JUST CAUSE* and *PROGRESSIVE DISCIPLINE*

Because the standards of just cause and progressive discipline are the basic protections for employees against unfair discipline, and because my interpretation and application of their meaning is key to understanding the rationale for this AWARD, I place this section as a separate discussion to follow the foregoing listing of primary relevant contractual provisions

Just cause and progressive discipline are the common law of workplace discipline as it has been universally applied for many decades in the arena of collective bargaining in this country. They have served as a general body of understandings of what fairness means, seeking to "fit the punishment to the crime." Though not so in this case, often the parties to an agreement define specifically how the concepts are to be applied in specific situations. They can be characterized as a body of common-sense requirements that help both employees and their employers: the latter, who believe that employer investment and employee skills are often worth salvaging and - for employees - by providing a reasonable measure of protection, the more so for those who have committed themselves to the employer's success with long service characterized by good performance.

Some of the common sense concepts are:

(a) The employee is obligated to perform in accordance with the employer's legitimate, business - related requirements: however, the employer is responsible for clearly communicating what they are and judging fairly the employee's performance.

arbaward:Negy -p.2

{b} If performance fails to meet standard, the employee is entitled to be confronted, and given an opportunity to improve. Obviously there are exceptions to this concept where the behavior is especially egregious (e.g. the employee makes an unprovoked physical attack on someone at work}. Providing opportunity for improvement, rather than termination - the capital punishment of the workplace - is what is intended by progressive discipline. Just cause has come to include progressive discipline by definition as one of its tenets.

(c) Just cause includes the requirement that an employee is not disciplined without due process: by being confronted with the.evidence and being given an opportunity to defend. The employer bears the burden of proof, the usual standard of proof in discipline is "preponderance of the evidence", sometimes stated as "clear preponderance of the evidence".

(d} Both long service and quality of performance factor into the application of the just cause standard. Long service carries with it an element of equity that accumulates in the favor of an employee, unless that service is characterized as flawed by poor performance. One can say that just cause recognizes that length of service counts for something, and that "something" depends on the totality of circumstances during the period of employment. Quality of performance during the period of employment plays heavily in disciplinary decisions.

{e} Performance rating by the employer is a key measure guiding assessment of what that quality of performance counts for. Positive performance counts for positive consideration and negative performance the opposite. Applying just cause requires assessment of both. Once again, I stress that some offenses - heinous in nature - need not require progressive efforts to try salvage of an employee before terminating.

Quality-of-performance evaluations by the employer are important also for the messages the employer sends to the employee. They can serve as a prelude to discipline, or they can also serve as validation: a "keep up the good work" message.

SOME BACKGROUND TO THE DISPUTE

George Floyd died in late May of 2020. There followed a prolonged emotional outburst of outrage throughout the country. Orlando was no exception. Some of the outrage was expressed in social media. Dr. Negy had a twitter account at that time through which he communicated in the community, but not as part of his function at UCF. Some of his alleged views, as interpreted from his statements on twitter, were the cause of reactions accusing him of lack of sympathy, even racial prejudice. The local newspaper carried stories about him. A group mostly of outraged student protesters gathered June 3 at the University to make known their protest of Dr. Negy.

arbaward:Negy -p.3

NEGY000832

They were greeted by the President of UCF, the Interim Provost-VP for Academic Affairs, and the Interim Chief Equity, Inclusion and Diversity Officer.

The response of the Administration there was sympathy with the protestors and denouncement of Dr. Negy. The next day the University issued a written statement repeating its position and soliciting complaints from current or former students about any belief that any of them may have experienced abusive or discriminatory behavior by any faculty or staff member. Instructions on how to report complaints were offered.

Thereafter, a flow of complaints about Dr. Negy was documented. Over 100 specific complaints were selected by the University. The Office of Institutional Equity (OIE) conducted the processing of the responses, which process consisted of 3 main steps: (1) the complainant told the interviewer from OIE about the complaint or complaints; (2) the interviewer wrote a summary of the complainant's story and emailed it to the complainant; (3) the interviewer then asked the complainant to sign and return the summary. An unreturned statement was accepted by OIE as valid, as if it were signed. Many were not returned. All the statements were later reviewed, analyzed for how valid they were considered to be by OIE, and judged as to whether or not they would be used as evidence against Dr. Negy. A majority of the complaints were determined to be of questionable validity for such use. Those considered "valid" were used against him directly. Also in evidence were some of the tweets issued by Dr. Negy during the storm of community outrage, even though all his tweets were determined to be protected against reprisal by the First Amendment.

Eventually Dr. Negy was called in for interviews to be shown the complaint summaries and given an opportunity to defend against those that made the cut as sufficiently valid. His requests to be provided in advance with the evidence to be used against him - so he could prepare - were turned down. During the 9-plus hours of interviews over a two-day period he was shown the complaints as well as whatever other data was available. Later, when the charges were drafted, he was charged with an additional nine instances of giving misleading statements during his interviews, based on his answers during the interviews.

As for Dr, Negy's evaluations by UCF, the record shows no detrimental evaluations at all. On the contrary, he was awarded the prestigious UCF TIP award three times: 2003, 2008, and 2015. A review of Dr. Negy's last 5 annual evaluations reveals that from 2015 through 2019, he was rated as overall outstanding. In 2019 that included every category rated, as well.

As described in UCF exhibit 2, p.17, footnote 8, "…TIP award rewards 'teaching productivity and excellence' and 'recognizes in-unit employee contributions to UCF's key goals of offering the best undergraduate education available in Florida and achieving international prominence in key programs of study." …

arbaward:Negy-p.4

NEGY000833

"...To be eligible for the award, the employee must be (1) classified as in-unit; (2) hold a full-time appointment; (3) have four years of continuous non-OPS service immediately prior to the current year; and (4) not have received the award during the previous five years...."

Some six months after the investigation started, in June, 2020, the charges of misconduct were levied and a Notice of Termination was issued on January 29, 2021.

## SUMMARY OF POSITIONS OF THE PARTIES

### UCF

The University, in its post-hearing brief, focused extensively on the procedure employed by OIE as it evaluated each of the complaints and separated them into undisputed findings and disputed findings: if disputed, a determination made whether offensive legally or not. If OIE found First Amendment or Academic Freedom protection, that complaint was eliminated from adverse consideration. The overwhelming conclusion advanced by UCF was that the evidence painted a picture of unrelenting verbal abuse over an extended period. There was no room in that UCF analysis for consideration of less than termination. Also, significant adverse weight was given to the allegation that a 2014 failure by Dr. Negy to take appropriate action against a male Teaching Assistant upon complaint by a female student of the behavior of that TA, as indicative of the security danger of some of Negy's transgressions.

The testimony of Dr. Johnson, Provost and Executive Vice-President for Academic Affairs, offered during the hearing, sheds more light on various aspects of the University's decision-making process in this case. Having been in the line of management of Dr. Negy for a number of years, he was asked about his general understanding of the grievant's performance history... "I had a general sense that he was a good teacher who taught controversial subjects well." (tr.p.90)

When Dr. Negy was considering leaving for another post at one point in time, Dr. Johnson explained that he agreed "...to an out-of-cycle raise..." to keep him at UCF. (tr.p.91)

Asked about his reactions to the OIE report of the complaints that were collected after the June 3, 2020 community outburst, he asserted he became "...greatly dismayed ... when all this came out, when I read the report, to see that so many students understood him to have misbehaved in various ways in the classroom, and believed that they had tried to make that point known ... and that concerned me a great deal. Because what it meant was, we didn't have a good system in place to help students report misbehavior, misconduct..." (tr.pp.97-98)

In reference to the 46 specific incidents that were listed in UCF exhibit 2, pages 179 to 181, that OIE determined were not protected by academic freedom, Johnson testified: "...I was not aware. This was part of what made this painful to me, was the recognition that this went on ...

Arbaward:Negy-p.5

NEGY000834

... behavior that, frankly, I will call, it's the worst behavior of this sort that I've ever seen in my 30 years in higher education! It was dismaying to learn that this had gone on, apparently for years, that students knew about it and complained to one another, and it had not come to my attention, either as Associate Dean or Dean (tr.p.103)....This is a case where a faculty member abused his authority in the classroom to insult and demean students, make completely inappropriate and unnecessary comments associated with sex and sex orientation, gender identity, remarkably insulting statements to students regarding their religious beliefs and other personal convictions.... I thought it was abusive. It was misconduct.... It should be things that challenge students' beliefs.... But we demand that this be done ... with an adequate degree of respect.... it does not permit me to be a bully, to be abusive, to discriminate. And my conclusion is that all of those things took place here." (tr.pp.103-104)

When asked if he read any of the students' comments associated with the complaints, Johnson stated he read those of one semester's classes, summarizing: "...they were sort of, a typical mix of comments that most of our faculty get... it wasn't like there was, you know, comment after comment about misbehavior." (tr.p.121)

When questioned about the decision to not allow the grievant the 6-month notice period before termination, Dr. Johnson summarized" ... It's because Dr. Negy's chief job is teaching, and we had come to the conclusion that his behavior in the classroom was unacceptable, was deleterious to students and was dangerous. We didn't see any way to put him safely in a classroom situation again."(tr.p.110)

When asked about behavior that can be corrected, Johnson replied: "... So everything depends on magnitude of offense....When we look at discipline, we look at the whole collection of misconduct that's been sustained ....A lot of misconduct is one thing, a little misconduct is another." (tr.p. 135)

**xxx**

UFF

The Union, in it's post-hearing brief, made extensive arguments alleging inconsistencies in the charges relating to the University policies underlying some of the charges, including whether or not the alleged violations coincided with the time periods the policies were in effect and whether the policies actually covered the behavior described. Also, the entire investigation process was questioned, particularly the matter of the validity of the "statement summary" approach. Also questioned was the content of the Notice of Termination, allegedly failing the requirement of any reason for or determination that Dr. Negy's actions adversely affected the functioning of the University or jeopardized the safety or welfare of the employees, colleagues, or students. These and other defenses are considered further, below.

Arbaward:Negy-p.6

NEGY000835

As for specific responses to specific allegations, Dr Negy's January 19, 2021 letter in response to the Notice of Intent to Terminate of January 13, 2021 (UFF ex. 33), includes arguments made in his defense. Following are some relevant excerpts:

"... I would like to address each of the four major issues raised in your Notice ... I would also like to state that I am more than happy to discuss in greater detail any of the individual findings in the OIE report that comprise these broader findings: while you stated in your Notice that they are 'too numerous to fully document here,' I am prepared to defend against each and every one of these findings in detail and, to the extent your ultimate decision relies on one or more specific findings not covered in my responses here, I would appreciate the opportunity to address those specific findings.

>  {1} That I provided false information during OfE's investigation"

It is simply stunning that UCF would make this finding based on my failure to perfectly recollect things said over the course of 15 years - after I begged, in writing, for notice of the allegations against me so that I could adequately prepare for my investigative interviews. I have all of my efforts to learn more about the allegations - and all ... denials ... in writing ....

>  (2) That I created a hostile learning environment for [my] students through discriminatory
>
>  Harassment," and violated "UCF's Employee Code of Conduct."

While OIE's investigation has confirmed what my Chair, Provost Johnson, and you have known for years - that I am a controversial instructor who has ruffled more than a few feathers over the years - none of OIE's findings against me rise even remotely to the level of hostile environment harassment... conduct 'so severe or pervasive that it unreasonably interferes with, limits, deprives, or alters the terms or conditions of education ... when viewed from both a subjective and objective perspective.' This is a narrowly drawn definition because, as UCF knows, speech cannot be prohibited simply because someone finds it offensive, even deeply so.

A handful of constitutionally protected but arguably provocative comments, cherry-picked from over the course of 15 years spent teaching thousands of students, do not even remotely rise to this level. ... A number of the comments cited by OIE as alleged evidence of a hostile environment were, contrary to OIE's analysis, clearly protected by academic freedom ...

Others were examples of incidental remarks that I made in an effort to inject humor into my lectures, which is something that has always been a part of my teaching style .... I have occasionally made jokes that landed poorly and offended some students ....

Yet other comments ... simply reflect some students' discomfort with my pedagogical style. As you know, I do not withhold controversial or sensitive information or topics from students ...

withholding information or avoiding "sensitive" topics is a form of paternalism and is educationally a disservice to students."

Arb award :Negy-p. 7

With respect to a complaint that Dr. Negy's inclusion of a controversial test question was improper, he responded in part, as follows:

"I do acknowledge that the question's wording does not fully capture the aims I described,,, and I wish that I had phrased it differently. But again, I submit that no one's 20+ year career has been devoid of mistakes, and an inartfully phrased exam question is cause for conversation, not termination ...

(4) *That I "failed to report" a sexual assault allegedly disclosed to me in February 2014*

This simply is not accurate. In 2014, two female students entered my office and told me they didn't feel comfortable being in close proximity to my volunteer undergraduate teacher-assistant...I asked what happened, and they told me they were at a gathering ... and that my T.A. went and sat right next to them and made them feel very uncomfortable ... he was speaking to them in a way as if he wanted them to be interested in him romantically ... the two students told me twice that my T.A. had not touched them physically ....

In summary, I want to highlight that this incident was known to multiple parties at the time and that beyond that initial phone call, no one from UCF ever raised the issue of my failing to report the alleged sexual assault until now ...

In 2014 when this incident occurred, I had never been trained or mandated to obtain training about my reporting obligations to report what my students told me - that my T.A. sat down next to them at a party and spoke to them in a way that made them uncomfortable - then the university failed to appropriately train me in this."

DISCUSSION AND CONCLUSIONS

This case is both complicated and simple. It is complicated because there are all manner of issues that have been raised and more could be: effect of use of protected free speech texts; announcement pre-investigation that Dr. Negy was a pariah in the view of the administration; the extensive search into antiquity of reasons to castigate the grievant (one complaint went back to 1998); the use of the "summary" approach to complainants, wherein a university investigator served as a filter or interpreter to the complainant; indeed, the very value of the summaries as evidence; where does academic freedom end?; and more. However, my charge as arbitrator is to judge whether the JUST CAUSE standard was met in this case by the University, the party with the burden of meeting the requirements of that standard. Therefore, I will not take on any issues other than what is necessary to meet my prescribed obligation. In the process, the answer to the first stipulated issue is subsumed in the answer to the second stipulated issue: was UCF justified in overriding the 6-month notice requirement?

arbaward :Negy-p.8

NEGY000837

UFF listed the many outstanding accolades offered the grievant by UCF such that Dr. Negy can reasonably claim that his employer kept telling him through its treatment of him to "keep up the good work," thus encouraging the continuation of his style of instruction. He did admit to some imperfections, and said he would have readily adjusted if he had been so informed.

I conclude that Dr. Negy demonstrated a willingness to entertain some change in his style of instruction; however, the record is devoid of any clear evidence that any member of his management requested such effort.

UCF, in its brief, as well as in the testimony of Dr. Johnson, focused mainly on the complaints that OIE said were violations of law. Thus, Negy crossed the line into abusive performance, hence serious misconduct. However, those charges need not be resolved by me.

What determines the outcome of this dispute is the interpretation of the meaning of Just Cause illuminated and guided by the facts.

The facts persuasive are that we have a professor of some 18 years tenured with consistently outstanding annual evaluations, with three TIP awards, recipient of a special pay adjustment successfully designed to persuade him not to leave UCF. There is no evidence that UCF gave him reason to believe he was anything but as highly esteemed as his evaluations and treatment, with no reason to perform differently.

At some point in 2020 a furor erupts over tweets from his twitter account, activity not related to his duties and also is protected free speech. There ensues a campaign by UCF to find out more about Dr. Negy's classroom performance as related by his students. UCF reaches out to previous students, gets a number of responses and determines that serious misconduct has been occurring for years, lamenting that no system for detecting such misconduct existed to alert management to such disrepute. And, the misconduct is of such magnitude that the only course of action is immediate termination.

"NOT SO," says Just Cause, that protective device designed to provide due process for employees in cases of discipline. Because this is an employee with more than 20 years of service teaching some highly emotion-laden courses that the employer has evaluated consistently as about as good as it gets, the employer is obligated to bring more to bear than a consideration long after the fact of how bad was the performance, the stated rationale by Dr. Johnson. UCF was also obligated to consider who was at fault for what, and how do the concepts of just cause and its instrument - progressive discipline - play into the decision - making dealing with the deficiencies alleged.

arbaward:Negy-p.9

Put more bluntly, UCF made the basic mistake of acting as if management bore no responsibility. Nor did it give consideration to the messages in the form of evaluations and rewards sent year after year to validate Dr. Negy's teaching, and now it wants to blame only him - with capital punishment - for what it retroactively sees as serious misconduct.

Management cannot escape its obligation to clearly communicate its requirements. It must also be clear in what it communicates about performance. It does no justice to claim it made enormous evaluations errors for 20-plus years and then castigate the employee with termination.

Just Cause requires more consideration of Dr. Negy than what UCF offered. It is not a matter of sufficiency of evidence to prove misconduct years after the fact after you have heaped accolades for the performance period now being reviled.

 No claim was made that Dr. Negy is not capable of responding to a demand by UCF that he modify his teaching practice to meet appropriate demands for change. The decision appears to have been taken based on Dr. Johnson's conclusion, as he testified "... it's because Dr. Negy's chief job is teaching, and we had come to the conclusion that his behavior in the classroom was unacceptable, was deleterious to students, and was dangerous. We didn't see any way to put him safely in a classroom situation again" (tr.p.110).  Saying so does not end the matter.

The University appears to use the 2014 incident with the female complaint about the TA to buttress its claim that Dr. Negy  creates a safety risk.  I find that Dr. Negy's account of his actions in that case is a plausible accounting, not overcome by evidence rising to the level of credible.

Once again, management failed the requirements of Just Cause in that UCF made no effort to offer Dr. Negy an opportunity to make whatever appropriate changes to his conduct in the classroom or, alternatively, determine and support a conclusion that Dr. Negy was incapable of corrected behavior, therefore unqualified for the protections of Just Cause. I find it unnecessary to make any determination that any specific charge or complaint was proven as a matter of evidence, inasmuch as there was basic absence of due process by UCF.

**xxx**

# AWARD

THE UNIVERSITY VIOLATED ARTICLE 16.7 IN THAT THERE WAS NOT JUST CAUSE TO TERMINATE DR. NEGY ON JANUARY 29, 2021.

THE REMEDY IS FULL REINSTATEMENT, WITH TENURE, AND WITH ALL COMPENSATION AND BENEFITS FULLY RESTORED TO THAT IN EFFECT AS OF THE TERMINATION DATE.

Dated: May 16, 2022

Palm Beach Shores, Florida

Signed: _____

Ben Falcigno

DATED: May 16, 2022

I,---- ----- ----, do hereby affirm upon my oath as Arbitrator, that I am the individual described in and who executed this instrument, which is my AWARD

NEGY000840