UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**CHARLES NEGY,**

**Plaintiff,**

**v.** **Case No. 6:23-cv-666-CEM-DCI**

**S. KENT BUTLER, ALEXANDER CARTWRIGHT, TOSHA DUPRAS, MICHAEL JOHNSON, and NANCY MYERS,**

**Defendants.**

_________________________________/

# ORDER

THIS CAUSE is before the Court on Defendant S. Kent Butler's Motion for Summary Judgment ("Butler's Motion," Doc. 59); Defendants Alexander Cartwright, Tosha Dupras, and Michael Johnson's Motion for Summary Judgment ("Cartwright, Dupras, and Johnson's Motion," Doc. 60); and Defendant Nancy Myers's Motion for Summary Judgment ("Myers's Motion," Doc. 61), to which Plaintiff filed a Response (Doc. 88), and Defendants filed a Reply (Doc. 93). For the reasons set forth below, Butler's Motion will be granted; Cartwright, Dupras, and Johnson's Motion will be denied; and Myers's Motion will be granted in part and denied in part.

## I. BACKGROUND

In the late spring of 2020, Plaintiff, an associate professor at the University of Central Florida ("UCF"), took to his personal Twitter account to air his views about race.[1] These views proved incendiary. Not long after, those outraged by Plaintiff's tweets embarked on a Twitter campaign: #UCFfirehim. (*See* Butler Dep., Doc. 63, at 88). Then, they called on Defendants to act. At the time, Defendants all held leadership roles at UCF: S. Kent Butler was Chief Equity, Diversity, and Inclusion Officer, (*id.* at 18); Alexander Cartwright was President, (Cartwright Dep., Doc. 64, at 71); Tosha Dupras was Interim Dean of the College of Sciences, (Dupras Dep., Doc. 66, at 19–20); Michael Johnson was Interim Provost, (Johnson Dep., Doc. 68, at 15–16); and Nancy Myers was Director of the Office of Institutional Equity ("OIE"), (Myers Dep., Doc. 70, at 15, 23).

On June 4, 2020, Cartwright, Johnson, and Butler issued a statement titled "Addressing Intolerance in our Community." (Doc. 68 at 257). The statement condemned Plaintiff's tweets and noted that the administration had "receiv[ed] complaints alleging bias and unfair treatment in [Plaintiff]'s classroom and [they] ha[d] launched an inquiry to gather more information." (*Id.*). Little over a month

[1] For instance, he tweeted: "Black privilege is real. Besides affirm. action, special scholarships and other set asides, being shielded from legitimate criticism is a privilege. But as a group, they're missing out on much needed feedback." (Doc. 68 at 251). Another example: "Sincere question: If Afr. Americans as a group, had the same behavioral profile as Asian Americans (on average, performing the best academically, having the highest income, committing the lowest crime, etc.), would we still be proclaiming 'systematic racism' exists?" (*Id.*).

later, on July 17, OIE notified Plaintiff it had launched a formal investigation into his classroom behavior. (Doc. 70 at 48–50).

As part of that investigation, OIE received a deluge of complaints, (*see id.* at 52), and Plaintiff was interviewed about the allegations against him, (Arbitration Proceedings, *id.* at 815). Before the final report was published, Myers met with Dupras and Johnson, among others, to discuss OIE's findings; she recommended Plaintiff be disciplined. (Myers Dep., *id.* at 34–35). Based on the findings, everyone in attendance agreed that Plaintiff should be terminated. (*Id.* at 35). Myers's findings were published in OIE's final report on January 13, 2021. (Investigative Report, Doc. 70, at 255–509). That day, Plaintiff was notified of the decision to fire him and that he would not be afforded the six-months' notice required by the Collective Bargaining Agreement. (Notice of Intent to Terminate, Doc. 71, at 272–75).

Although he was reinstated to his position after taking his grievance to arbitration, (Cartwright Dep., Doc. 65, at 56), Plaintiff filed this suit. The Court previously granted in part Defendants' Motion to Dismiss, disposing of several claims. What remains are two claims brought pursuant to 42 U.S.C. § 1983—Count I, against all Defendants, for First Amendment retaliation and Count II, against just Myers, for violation of his right to free speech. Defendants move for summary judgment on both.

## II. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it may "affect the outcome of the suit under the governing law." *Id.*

"The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Allen v. Bd. of Pub. Educ.,* 495 F.3d 1306, 1313–14 (11th Cir. 2007). In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). But when faced with a "properly supported motion for summary judgment," the nonmoving party "must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997) (citing *Anderson*, 477 U.S. at 248–49 (1986)); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "[T]he proper inquiry on summary judgment is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Stitzel v. N.Y. Life Ins. Co.*, 361 F. App'x 20, 22 (11th Cir. 2009) (quoting *Anderson*, 477 U.S. at 251–52). Put another way, a motion for summary judgment should be denied only "[i]f reasonable minds could differ on the inferences arising from undisputed [material] facts." *Pioch v. IBEX Eng'g Servs.*, 825 F.3d 1264, 1267 (11th Cir. 2016) (quoting *Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

## III. ANALYSIS

### A. Qualified Immunity

Defendants invoke a qualified immunity defense on both counts. "To be entitled to qualified immunity, the defendant must first establish that he was acting within the scope of his discretionary authority. Once that is shown . . . , the burden shifts to the plaintiff to establish that qualified immunity is not appropriate." *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017) (internal citation omitted). It is uncontested that Defendants were acting in the scope of their discretionary authority.

"When confronting a claim of qualified immunity, a court asks two questions. First, the court considers whether the [official] in fact violated a constitutional right. Second, the court asks whether the contours of the right were sufficiently clear that a reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 21 (2015) (internal citations and quotation omitted). "This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (internal quotation omitted).

**B. First Amendment Retaliation**

*1. Decisionmakers*

As an initial matter, "[o]nly a person who has 'the power to make official decisions' can be individually liable for [ ] discrimination under section 1983." *McCarthy v. City of Cordele, Ga.*, 111 F.4th 1141, 1147 (11th Cir. 2024) (quoting *Quinn v. Monroe Cnty.*, 330 F.3d 1320, 1326 (11th Cir. 2003)). In Plaintiff's Response, he argues that Cartwright, Dupras, Johnson, and Myers were decisionmakers. (*See* Doc. 88 at 47–49). While he argues that Butler is not entitled to qualified immunity, Plaintiff provides no evidence to counter Butler's assertion that he was not a decisionmaker. And he cannot because the evidence shows Butler was not.

A decisionmaker must "ha[ve] the authority not merely to *recommend* [an employee's] termination" but to "effectuate" it. 330 F.3d at 1328 (emphasis in original). Here, Butler did neither. It is also Plaintiff's understanding that Butler was not involved in his termination. (Negy Dep., Doc. 72, at 45). The allegations against Butler—along with the evidence—relate only to his alleged solicitation of complaints against Plaintiff. (*Id.* at 46). Therefore, Butler is entitled to summary judgment as to Count I.

Myers also argues that she was not a decisionmaker because she lacked the power to fire Plaintiff. But that is not the only way for Plaintiff to hold her accountable. "At times, a discharge recommendation by a party without actual power to discharge an employee may be actionable if the plaintiff proves the recommendation 'directly resulted in the employee's discharge.'" *Gilroy v. Baldwin*, 843 F. App'x 194, 196 (11th Cir. 2021) (quoting *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir. 1999)). "But this causation must be 'truly direct'—the plaintiff 'must prove that the discriminatory animus behind the recommendation, and not the underlying employee misconduct identified in the recommendation, was an actual cause of the other party's decision to terminate the employee.'" *Id.* (quoting *Stimpson v. City of Tuscaloosa*, 186 F.3d at 1331).

"One way of proving that the discriminatory animus behind a recommendation caused a discharge is under the cat's paw theory, which provides

that a plaintiff may establish causation by showing that the decisionmaker followed a biased recommendation without independently investigating the complaint against the employee." *Id.* Although it was Rhonda Bishop, Myers's supervisor, who made the recommendation Plaintiff be fired, she did so based on Myers's findings in the Investigative Report. (Bishop Dep., Doc. 62, at 102–03). Thus, Plaintiff maintains that Myers can be found liable under the cat's-paw theory.

Moreover, Plaintiff argues that there is sufficient evidence that Myers cherry-picked from the evidence to arrive at the biased outcome so many desired. Plaintiff argues that the OIE procedures were not properly applied because he was only provided the nature of the allegations not the details of each complaint. (Myers Dep., Doc. 70, at 180–81). He also disputes the Investigative Report's finding that he provided false information. He characterizes it, instead, as instances of his faulty memory when asked about classroom occurrences that spanned over 15 years. (See, e.g., *id.* at 182 (showing that the audio recordings of Plaintiff's statements did not corroborate some of the accusations against him)). Plaintiff argues there is also evidence of animus in Myers's finding he had a motive to lie to protect his reputation and tenured status but never made such a finding about the creators of the Google Form who actively sought that he be fired. (Myers Dep., Doc. 70, at 68–69). Further, the witness statements on which the Investigative Report relied were OIE summaries that fewer than half the witnesses reviewed and signed. (Investigative Report

Appendix A, Doc. 66, 472–97). Although Myers stated that OIE performed an independent credibility assessment for the witness statements, she noted that the results were not written down and that it "was something [she] was assessing as [she] went through the record." (Myers Dep., Doc. 70, at 173).

The Investigative Report also found Plaintiff violated a UCF policy requiring faculty be "forthright and honest in the pursuit and communication of scientific and scholarly knowledge" by bribing a foreign official for yellow fever vaccine certificate in 2011. (*Id.* at 198–99). But he had published that incident in his book, *White Shaming*, long before this investigation began. (*Id.*). And while Plaintiff was certainly dishonest, even Myers acknowledged connecting his behavior to the "communication of scientific and scholarly knowledge" was a stretch. (*Id.* at 99). That coupled with a finding Plaintiff failed to report a sexual assault allegation, despite UCF administration's apparent prior knowledge about the incident, Plaintiff argues is further evidence of Myers' bias.

Plaintiff has introduced sufficient evidence to create an issue of fact as to whether Meyers' investigation and recommendation was biased. Because the decisionmakers here based their decision to terminate Plaintiff on the Investigative Report, Plaintiff may pursue a cat's paw theory of liability against Myers.

Lastly, there is no dispute that Cartwright, Dupras, and Johnson were decisionmakers. (*See* Johnson Dep., Doc. 68, at 97 (noting that "the decision in this

case really was . . . consultative and a collective one" and that Myers and Dupras were present at the meeting but not Cartwright); Dupras Dep., Doc. 66, at 130 (referencing Cartwright and Johnson and noting they "agreed collectively to make the decision not to give six months")). While Johnson and Dupras gave conflicting testimony about Cartwright's presence at the meeting, it is apparent Cartwright also had the power to effectuate Plaintiff's termination.

*2. Constitutional Violation*

"Speech that demeans on the basis of race, ethnicity, gender, religion, age, disability, or any other similar ground is hateful; but the proudest boast of our free speech jurisprudence is that we protect the freedom to express 'the thought that we hate.'" *Matal v. Tam*, 582 U.S. 218, 246 (2017) (quoting *United States v. Schwimmer*, 279 U.S. 644, 655 (1929) (Holmes, J., dissenting)). Plaintiff alleges that his termination was pretextual and based on his tweets—seen by many as hateful—that were protected by the First Amendment.

"Although the law is well-established that the state may not demote or discharge a public employee in retaliation for speech protected under the [F]irst [A]mendment, a public employee's right to freedom of speech is not absolute. *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989) (citing *Rankin v. McPherson*, 483 U.S. 378 (1987)). "[T]he state has an interest as an employer in regulating the speech of its employees and attempts to balance the competing

interests of the public employee and the state." *Stanley v. City of Dalton*, 219 F.3d 1280, 1288 (11th Cir. 2000) (citing *Rankin*, 483 U.S. at 384, and *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).

"To establish a First Amendment retaliation claim, the plaintiff must show first, that his speech or act was constitutionally protected; second, that the defendant's retaliatory conduct adversely affected the protected speech; and third, that there is a causal connection between the retaliatory actions and the adverse effect on speech." *Jane Doe I v. Valencia Coll. Bd. of Trs.*, 838 F.3d 1207, 1210–11 (11th Cir. 2016) (internal quotations omitted). Defendants only contest the third prong: causation. "[A] court must examine the record as a whole to ascertain whether the plaintiff presented sufficient evidence for a reasonable jury to conclude [his] protected speech was a substantial motivating factor in the decision to terminate [him]." *Kamensky v. Dean*, 148 F. App'x 878, 881 (11th Cir. 2005). "The plaintiff's burden in this regard is not a heavy one." *Stanley*, 219 F.3d at 1291.

"In *Stanley*, [the Eleventh Circuit] identified several relevant factors to consider, including: (1) the temporal proximity between the termination and the protected activity; (2) whether any reasons for the termination were pretextual; (3) whether any comments made, or actions taken, by the employer indicate the discharge was related to the protected speech; (4) whether the asserted reason for the discharge varied; and (5) any circumstantial evidence of causation, including such

facts as who initiated any internal investigations or termination proceedings, whether there is evidence of management hostility to the speech in question, or whether the employer had a motive to retaliate." *Kamensky*, 148 F. App'x at 881. "There is no one factor that is outcome determinative, but all factors must be taken into account." *Stanley*, 219 F.3d at 1291 n.20.

As for temporal proximity, the Eleventh Circuit has inferred causation "[w]here termination closely follows protected activity." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 745 (11th Cir. 1996). "However, [the Eleventh Circuit] ha[s] rejected any per se rule as to the length of time necessary to create such an inference." *Kamensky*, 148 F. App'x at 881 (citing *Beckwith v. City of Daytona Beach Shores, Fla.*, 58 F.3d 1554, 1566–67 (11th Cir. 1995)). Plaintiff received a Notice of Intent to Terminate on January 13, 2021, approximately seven months after UCF began receiving complaints about his tweets. (Doc. 66 at 234). However, the initial inquiry began on June 4, 2020—a day after Plaintiff advised his department chair by email that the public outcry over his tweets might lead to a "potential scandal." (Doc. 72 at 271). That email was forwarded to Dupras. (*Id.*). And the same day the inquiry began, Cartwright and Johnson publicly condemned Plaintiff's tweets, and Dupras emailed the College of Sciences that the administration was "aware of these tweets and [ ] actively working to address this situation." (Doc. 66 at 193).

Defendants maintain that Plaintiff was dismissed solely for his in-classroom behavior. While Plaintiff admitted that was the content of the investigation, (Negy Dep., Doc. 72, at 22), he contends the investigation itself was rigged from the start. So, the Court next turns to pretext, Defendants' comments, and circumstantial evidence. After the public outrage, Defendants Dupras, Cartwright, and Johnson all issued statements condemning Plaintiffs' tweets that included information about where to file reports against professors. (Doc. 66 at 193; Doc. 68 at 257).

In responding to demands Plaintiff be fired, Cartwright answered: "Sometimes we have to go through a process, as frustrating as [ ] that process is to me." (Cartwright Dep., Doc. 64, at 91). When later probed about what in the process frustrated Cartwright, he was unable to exactly identify his past concern. (*Id.* at 91–95). And when Dupras received an email from another UCF professor "request[ing], along with all students demanding [the] same, that students (and faculty and staff) are protected moving forward by [Plaintiff's] removal from the classroom." (Doc. 66 at 204). She responded, "I agree with the thoughts you have expressed in [y]our email." (*Id.* at 203)..

Turning now to Myers, who found that Plaintiff's tweets were protected speech, but nonetheless recommended discipline. (Investigative Report, Doc. 70, at 268 ("OIE found that the Respondent's Twitter posts involved matters of public concern and, accordingly, were protected by the First Amendment and could not be

the basis for a finding of misconduct or disciplinary action.”)). Plaintiff accuses Myers of stacking the deck against him. As discussed above in the decisionmaker analysis, there is an issue of fact as to whether Myers skewed the investigation against Plaintiff. That evidence is sufficient to also create an issue of fact here.

Taking all the factors into account and making all inferences in favor of Plaintiff, there is an issue of fact as to whether Plaintiff's protected speech was a substantial motivating factor in the decision to fire him. While a reasonable jury could find that Plaintiff was fired for his classroom behavior, “[a] reasonable jury could [also] infer that [Defendants], on notice that their goal was illegal, used a relatively slow and deliberate process to terminate [Plaintiff].” *Beckwith*, 58 F.3d at 1566.

But this is not the end of the Court's inquiry. “[I]f the employee prevails by showing that the speech was a substantial motivating factor in [Defendants'] employment decision,” Defendants can still prevail if they “prove by a preponderance of the evidence that ‘[they] would have reached the same decision . . . even in the absence of the protected conduct.’” *Bryson*, 888 F.2d at 1566 (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 286 (1977)).

Defendants contend that Plaintiff was fired for his non-protected in-classroom conduct, not his tweets. But the timing of Plaintiff's discipline creates an issue of

fact. Plaintiff had a reputation of using incendiary language, as another UCF professor noted. (Doc. 66 at 203 ("He has a long history of spewing dehumanizing, inequitable language for many years.")). Additionally, one of the gravest in-classroom accusations against Plaintiff was his failure to report a sexual assault allegation by a student against one of his teaching assistants ("TAs"). But Plaintiff maintains that the student in question never told him that his TA touched her. (Myers Dep., Doc. 70 at 159–60). It also appears that UCF administration knew about this allegation and Plaintiff's role in it. (Witness Statement, *id.* at 1614).

As Defendants tell it, Plaintiff had long been a menace upon UCF's campus. So why act now? Defendants assert it was because students were made aware of where to file complaints against professors and were assured that UCF would take their complaints seriously, contrary to the discouragement they had previously faced. (*See* Investigative Report, Doc. 70, at 287 (reporting comments made by Plaintiff such as: "[O]nce you have tenure, like I have at the university, unless I rape you—which I won't, I promise—the university can't fire me. They just can't fire me")). On the other hand, as discussed above, Plaintiff has offered evidence that the real reason was his protected speech. This is a material issue of fact that is for the jury to determine, not the Court.

*3. Clearly Established*

Next, the Court turns to whether the Constitutional right that was allegedly violated was "sufficiently clear that a reasonable official would have understood that what he is doing violates that right." *Mullenix*, 577 U.S. at 21. While Plaintiff was unable to provide the Court with a case that was an exact match to the facts here, that is not necessarily required. An official may not be entitled to qualified immunity "even if there is no reported case 'directly on point.' But 'in light of pre-existing law,' the unlawfulness of the offic[ial]'s conduct 'must be apparent.'" *Ziglar v. Abbasi*, 582 U.S. 120, 151 (2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 741 (2009), and *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

"Because no bright-line standard puts the reasonable public employer on notice of a constitutional violation, the employer is entitled to immunity except in the extraordinary case where *Pickering* balancing would lead to the inevitable conclusion that the discharge of the employee was unlawful." *Dartland v. Metro. Dade Cnty.*, 866 F.2d 1321, 1323 (11th Cir. 1989). As the Court previously determined, if a jury makes findings of fact in favor of Plaintiff, "[t]his is one of [those] extraordinary circumstances where *Pickering* balancing shows Defendants' conduct was unconstitutional." (Motion to Dismiss Order, Doc. 38, at 20).

Defendants' reasonable belief that they were not violating the First Amendment under these circumstances must withstand judicial scrutiny. Despite the

"breathing room" qualified immunity tends to afford state actors, this is not a situation where an officer made a split-second decision in the heat of the moment or where an unsophisticated party is acting. Unlike those situations, if decisions made in this context "may later seem unnecessary in the peace of a judge's chambers," then they most probably were to begin with. *Graham v. Connor*, 490 U.S. 386, 396 (1989). Defendants had ample time to make reasoned, thoughtful decisions regarding how they wished to proceed with the investigation. Moreover, they had the benefit of making those decisions with counsel.

"Official reprisal for protected speech offends the Constitution because it threatens to inhibit exercise of the protected right, and the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (quotation omitted) (internal citations omitted). Defendants maintain the evidence establishes they were solely motivated by lawful concerns regarding in-classroom harassment because the Investigative Report upon which they based the decision to fire Plaintiff specifically found the Twitter posts "were protected by the First Amendment and could not be the basis for a finding of misconduct or disciplinary action." (Doc. 70 at 267–68). But Plaintiff has created an issue of fact as to whether Defendants' investigation was rigged from the start.

"Where the facts assumed for summary judgment purposes in a case involving qualified immunity show mixed motives (lawful and unlawful motivations) and pre-existing law does not dictate that the merits of the case must be decided in plaintiff's favor, the defendant is entitled to immunity." *Foy v. Holston*, 94 F.3d 1528, 1535 (11th Cir. 1996). If this was a mixed motives case, Defendants would be entitled to qualified immunity. A reasonable jury, however, could find that Defendants' motives were entirely unlawful. As explained above, there is evidence showing they were motivated by their distaste for Plaintiff and his views along with public pressure. But in the words of Noam Chomsky: "If we don't believe in freedom of expression for people we despise, we don't believe in it at all." Furthermore, because, depending on the facts determined by the jury, the outcome of the *Pickering* balancing test could also favor Plaintiff, this could be one of those "rarest of cases [where] reasonable government officials truly know that the termination . . . of a public employee violated 'clearly established' federal rights." *Hansen v. Soldenwagner*, 19 F.3d 573, 576 (11th Cir. 1994). Thus, Defendants Dupras, Johnson, Cartwright, and Myers are not entitled to qualified immunity on Count I.

**C. Right to Free Speech**

In Count II, Plaintiff argues Myers violated his right to free speech by finding his in-classroom speech amounted to discriminatory harassment because many alleged instances were protected speech. Myers again invokes a qualified immunity

defense. As previously outlined, once it is established Myers was acting in a discretionary capacity, the burden shifts to Plaintiff to show that qualified immunity is inappropriate because she violated a clearly established constitutional right.

As with Count I, Plaintiff has not challenged that Myers acted in a discretionary capacity. But as for Count II, he has not met his burden to show that qualified immunity is inappropriate. The Court may approach the two-step qualified inquiry in any order. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

Here, regardless of whether a constitutional violation occurred, it was not clearly established. Myers can only have received fair notice that her actions were unconstitutional from a decision of the Supreme Court, the Eleventh Circuit, or the Florida Supreme Court. *See Loftus v. Clark-Moore*, 690 F.3d 1200, 1207 (11th Cir. 2012). Plaintiff provides none.

Additionally, in arguing that his in-class speech was protected, Plaintiff invokes the doctrine of academic freedom.[2] This concept is that, generally,

---

[2] Count II also appears to challenge Myers's interpretation of UCF's harassment policy. (*See* Response, Doc. 88, at 22–23). While Plaintiff cites to *Mendoza v. Borden, Inc.*, to take issue

"professors at public universities retain First Amendment protections at least when engaged in core academic functions, such as teaching and scholarship." *Meriwether v. Hartop*, 992 F.3d 492, 505 (6th Cir. 2021).

Myers relies on *Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991), to argue a professors' speech may be reasonably restricted during class time. There, the Eleventh Circuit upheld a public university's use of a memo directing a professor to "refrain from 1) the interjection of religious beliefs and/or preferences during instructional time periods and 2) the optional classes where a 'Christian Perspective' of an academic topic is delivered." *Id.* at 1075 (internal quotation marks omitted). The Court held that the university's interest that "courses be taught without personal religious bias unnecessarily infecting the teacher or the students" outweighed the professor's right to academic freedom and freedom of speech. *Id.* at 1076.

Plaintiff points to several cases from outside this circuit for his academic freedom argument. But, as noted above, case law from other circuits fails to create a right that is clearly established in the Eleventh Circuit. And in the Eleventh Circuit, *Bishop* remains good law. Under *Bishop*, a reasonable university official would not be on notice that her finding that a professor's in-class statements—particularly the

---

with Myers's interpretation of "severe and pervasive," that case involved an interpretation of Title VII's language. 195 F.3d 1238, 1245–46 (11th Cir. 1999).

ones listed, (Myers's Motion, Doc. 61, at 22)—amounted to harassment under the university's policy was a constitutional violation of a professor's academic freedom.

Myers was not entitled to qualified immunity in Count I because the retaliation claim alleges Plaintiff was terminated after a pretextual investigation based on his *tweets*. But in Count II the free speech claim is about her findings that his *in-class* comments violated UCF policy. That distinction makes all the difference. Myers is entitled to qualified immunity on Count II.

### D. Punitive Damages

"Generally, before an award of punitive damages is authorized in a civil rights action the jury must find, and the evidence must support its decision, that the defendant was motivated by an evil motive or intent, or there must be reckless or callous indifference to federally protected rights." *Anderson v. City of Atlanta*, 778 F.2d 678, 688 (11th Cir. 1985) (citing *Smith v. Wade*, 461 U.S. 30 (1983)). Because Plaintiff has created an issue of fact as to pretext, the jury may yet find that Defendants acted with reckless or callous indifference to Plaintiff's First Amendment rights. Therefore, granting summary judgment on Plaintiff's demand for punitive damages in favor of Defendants Dupras, Johnson, Cartwright, and Myers is inappropriate.

## IV. CONCLUSION

Accordingly, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendant S. Kent Butler's Motion for Summary Judgment (Doc. 59) is **GRANTED**.
   a. The Clerk is directed to enter judgment in favor of Defendant S. Kent Butler and against Plaintiff.
2. Defendants Alexander Cartwright, Tosha Dupras, and Michael Johnson's Motion for Summary Judgment (Doc. 60) is **DENIED**.
3. Defendant Nancy Myers's Motion for Summary Judgment (Doc. 61) is **GRANTED in part** and **DENIED in part**.
   a. The Clerk is directed to enter judgment in favor of Defendant Nancy Myers and against Plaintiff as to Count II.
4. Plaintiff's Unopposed Motion to Stay (Doc. 95) is **DENIED as moot**.

**DONE** and **ORDERED** in Orlando, Florida on May 12, 2025.

CARLOS E. MENDOZA
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record